### THE P. R. R. NO. 32.

### THE JOHN J. HAGUE.

(Circuit Court of Appeals, Second Circuit. January 9, 1917.)

### No. 110.

COLLISION ☞90(7)—TOWS MEETING—MUTUAL FAULTS.

> A collision occurred in the Kill von Kull in the channel between Shooter's Island and Staten Island, which is about 400 feet wide, between the tows of two meeting tugs, one having a single boat in tow and the other nine, in three tiers. The tows were passing starboard to starboard. *Held*, on the evidence, that the tug with the large tow was in fault for not allowing more room, the other tow being as close to the bank of Shooter's Island as it could get; that the other tug was also in fault for not waiting until the large tow had passed through the narrow channel, for not giving the proper bend whistle when approaching the island, and for failure to keep to the starboard side of the channel, as required by article 25 of the Inland Rules (Act June 7, 1897, c. 4, § 1, 30 Stat. 101 [Comp. St. 1913, § 7899]).

> [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202.]

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty for collision by Anthony O'Boyle, owner of the coal boat O'Boyle Brothers against the steam tug P. R. R. No. 32, the Pennsylvania Railroad Company, claimant, with the steam tug John J. Hague, the Tice Towing Line, claimant, impleaded. Decree for libelant against the P. R. R. No. 32, and her claimant appeals. Modified and affirmed.

Burlingham, Montgomery & Beecher, of New York City (Charles C. Burlingham and Benjamin W. Wells, both of New York City, of counsel), for appellant.

Park & Mattison, of New York City (Henry E. Mattison, of New York City, of counsel), for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. This is a suit in admiralty brought by the libelant as the owner of the coal boat O'Boyle Brothers against the steam tug P. R. R. No. 32, owned by the Pennsylvania Railroad Company. The latter, under the fifty-ninth rule in admiralty (Comp. St. Ann. 1916, p. 2706), has impleaded the steam tug John J. Hague, owned by the Tice Towing Line. The suit grows out of a collision which occurred on June 30, 1913. About 4 o'clock in the afternoon of that day the tug John J. Hague took in tow at Carteret, N. J., the O'Boyle Brothers and started for Jersey City. The O'Boyle Brothers was towed astern on two hawsers, which ran from the bow of the boat to the

stern of the tug and were about 25 feet in length. On approaching Shooter's Island in the Kill von Kull, the steamtug P. R. R. No. 32 was encountered with a tow of nine boats arranged in tiers of three boats abreast. The P. R. R. No. 32 was on the starboard side, the Staten Island side, of the John J. Hague. The collision took place at the upper end of Shooter's Island.

The master of the Hague testified that he first saw the P. R. R. No. 32 when he got within 400 feet of Shooter's Island. The tug Kimpland was ahead of his tug and going in the same direction he was. He testified he first saw that tug as she was "entering Shooter's Island" with a loaded mud scow on her starboard side. The Kimpland passed No. 32 on the Shooter's Island side of the channel, passing starboard to starboard. When the Kimpland got clear of No. 32's tow the Hague was probably 50 or 75 feet astern. The captain of the Kimpland testified that in going through his tug (the Kimpland) rubbed "along all the way" from the beginning to the end of tow No. 32, and that he went ahead very slowly. His testimony was, "I wasn't going at all, hardly." The Kimpland was a powerful tug, 95 feet long, and was about twice as large as the Hague. The Hague followed, but without the same success. The last scow, the deck scow in No. 32's tow, came into collision with the O'Boyle Brothers, which the Hague had in tow. The deck scow was in the last tier of the tow, and was the starboard boat in the tow, and struck the O'Boyle Brothers with the starboard bow corner, causing considerable damage.

The pilot of the Kimpland, who saw the collision, testified that the last boat in No. 32's tow was out of line, and that she stood about 2 feet outside of the other boats. Asked how the boats came into collision, he answered, "Well, the Pennsylvania scow fouled this canal boat, or whatever it was, that the Hague had in tow." He was asked what happened to the tow of No. 32 after he cleared it, and replied, "It floated across my stern as I passed by it," and "towards Shooter's Island." He also testified that the Hague and her tow was "right up against Shooter's Island." He was asked whether the Hague could have gone any further over that way, and he replied, "She was hard up against it." The master of the Hague testified that when the collision occurred his engines were stopped and his tow was up against the shore. He cleared the first two tiers of No. 32's tow without touching, but the last boat in the tier, which projected out, struck, and if that boat had been in line with the other tiers there would have been no trouble. There was some testimony to the effect that the O'Boyle Brothers took a sheer, which caused the collision. It is most improbable that any such thing happened, for the O'Boyle Brothers was held by two short hawsers, which were made fast to the stern bits of the Hague. Moreover, the wind, which was southwest, would have blown her the other way. It would naturally take No. 32's tow towards the Hague's tow.

The court below found no fault attributable to the Hague, and that No. 32 was alone at fault. We concur in thinking that No. 32 was at fault. She presented from her bow to the tail of her tow an obstruction some 500 feet long, gradually taking up more and more of the whole channel. No 32 was clearly in fault for not pulling her tow over

toward the Staten Island side of the channel, out of the way of the Hague and her tow.

The question remains to be considered whether the Hague was free from fault. The court below thought she was. We are unable to coincide in that opinion. It seems to us that, as No. 32 was proceeding with the tide and burdened with a tow of some proportions, she should have waited until No. 32 and her tow were out of the way. Moreover, as the two tugs were approaching each other in a narrow channel, with the bend at Shooter's Island between them, it was the duty of both tugs to sound a long blast of the whistle on approaching the bend. No. 32 did so. The Hague did not, and because she did not she is not free from fault. Moreover, the Hague is to blame for undertaking to force her way through and in following the lead of the Kimpland. She was bound to know that under the circumstances plainly visible the stoppage of No. 32's way would aggravate the effect of the wind on 32's tow, and that it would be more difficult for her to skin through between the tow and Shooter's Island than it had been for the Kimpland. The Hague was not bound to keep on going ahead. The passage of Shooter's Island is at all times difficult. If the Hague was afraid of the light tug, Brinton, which was on the Staten Island side of the channel, all she had to do was to stop with the tide against her and let No. 32 go by. But the fact that the Brinton was there really proved nothing. Light tugs can get out of the way, and it is not clear to us that she was blocking up the channel, or interfering with navigation on that side.

The collision occurred in a narrow channel; the Kill von Kull being at the place of collision about 400 feet wide. The narrow channel rule was applicable. Article 25 of the Inland Rules provides that:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

As the tug No. 32 was about in the middle of the channel, there was sufficient space on the Staten Island side for the Hague and her tow to have passed and to have obeyed the statute. The captain of the Hague tries to excuse himself for his failure to comply with the rules because "the Brinton was around in there," and "it wasn't safe," and that in doing so he "might have been crossing his (No. 32's) bow." His excuse is a futile endeavor to justify his failure to obey the statute. The testimony is clearly against him. The Brinton was back in her slip. Although she had started to come out, she had gone back in responding to the signal blown to her for the purpose by No. 32, and the weight of the testimony shows that there was no other boat there that was obstructing the channel. His own tug was only 17½ feet beam, and the scow he had in tow only 28 feet beam, so that if he had a channel of 200 feet, or even 100 feet, of clear water between No. 32 in the middle of a 400-foot channel and the Staten Island shore, it would have been perfectly safe for him to have gone that way. There is no sufficient excuse for her being on the wrong side of the channel.

It is undoubtedly true that the narrow channel rule must be construed in the light of common sense, and that it is not an inflexible

rule to be followed in all cases, but only when it is safe and practicable. But the evidence satisfies us that in this case it would have been safe and practicable to have obeyed it. Both tugs being at fault, the amount of the stipulated damages must be divided between them.

The decree must be modified in accordance with this opinion, and, so modified, is affirmed.