**THE McLAIN NO. 2.**

**THE BRIMSTONE.**

**THE SOUTHERN CROSS.**

**McLAIN, Inc. v. STEAMTUG BRIMSTONE, Inc. et al.**

**PILLSBURY FLOUR MILLS OF MINNEAPOLIS v. SAME.**

**Nos. 15171, 15196.**

District Court, E. D. New York.

March 8, 1940.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald J. McKernan, of New York City, of counsel), for libellant.

Foley & Martin, of New York City (C. E. Heckman, of New York City, of counsel), for respondent the Brimstone.

Mahar & Mason, of New York City (W. J. Mahar, of New York City, of counsel), for the Southern Cross—New York Marine Co.

GALSTON, District Judge.

These causes were consolidated by court order. It appears that on October 12, 1936, some time after midnight, the tug Southern Cross, towing the barge McLain No. 2, as the hawser boat, and the barge Chicago as the tail boat, was proceeding from Buffalo to New York on the state barge canal. Shortly after passing Medina the libellant contends that the tug and tow, while navigating on their proper side of the canal, observed the tug Brimstone pushing the oil tanker Arthur H. Merry proceeding in the opposite direction, and that the Brimstone permitted the Arthur H. Merry to sheer across the course of the Southern Cross, bringing the port bow corner of the tanker Arthur H. Merry into collision with the port bow of the barge McLain No. 2.

The answer of the Steamtug Brimstone, Inc., as claimant of the tug Brimstone, sets forth that the Brimstone, after passing under the Bridge 208, sounded a bend whistle; that shortly thereafter the Southern Cross with her tow sounded a bend whistle; that the Brimstone tow thereupon, under a slow bell altered its course to starboard and proceeded slowly on a course close to the canal wall; that as soon as the Southern Cross was sighted the Brimstone

tow, holding its course, sounded a one whistle signal, stopped engines and operated to keep the tow flush with the canal wall; that the Southern Cross tow, while attempting to pass was not rigged for steering as required by the canal rules of navigation, sheered to port and the port bow corner of the McLain No. 2 came into collision with the port bow corner of the Arthur H. Merry.

The Pillsbury Flour Mills Company, as owner of the cargo of flour laden on board the barge McLain No. 2, filed its libel against the Brimstone for cargo loss.

The New York Marine Company, impleaded on the petition of the Steamtug Brimstone, Inc., in the libel of the McLain Line, Inc., as owner of the barge McLain No. 2, sets forth substantially the allegations of the McLain Line, Inc., libel against the tug Brimstone.

In the welter of contradictory testimony and discrepancies it appears that the collision happened shortly after midnight of October 12, 1936. The Southern Cross had the two barges, McLain No. 2 and Chicago, in tow, both loaded, McLain with flour and the Chicago with scrap iron. The two barges were made fast together and the tug had them on short hawsers of about 35 feet from the stern of the tug to the bow of the McLain No. 2. This left about 25 feet of water between the stern of the tug and the bow of the barge. This tow passed the bridge at Medina, bound east on the barge canal. The condition of equipment, including hawsers, was good. There was a full crew aboard. No trouble was encountered in controlling the barges at any point, including the bends. Some time after leaving Medina the Southern Cross blew a bend signal west of the guard gate. This was for the purpose of notifying any west bound boats of the approach of the Southern Cross tow. Some time later, after the Southern Cross was on the straight way, having made the bend, a blast was heard from the Brimstone. At that time the Southern Cross was on the starboard bank. The width of the canal at that point was from 90 to 100 feet. The Southern Cross answered with a blast signal. When one whistle signals were exchanged the Brimstone was coming out of the guard gate. The gate is about 300 feet east of the concrete wall located on the northerly side of the canal. The Southern Cross, on rounding the bend, had proceeded

under a slow bell and on exchanging signals slowed down to two jingles, continuing to follow the starboard bank. About 1000 feet separated the two vessels at the time the one whistle signals were exchanged. When this distance was reduced to 100 or 200 feet the Brimstone took an unexpected sheer towards the south bank. In the light of that condition, when the Arthur H. Merry was but a few feet off the Southern Cross the mate in charge on the Southern Cross rang an extra hook-up in the effort to pull the bow of the McLain closer to the starboard bank and particularly the port corner of the McLain No. 2 away from the port corner of the Arthur H. Merry. But the port corner of the Arthur H. Merry hit the Southern Cross amidship on her port side and bounced off, running into the port corner of the McLain No. 2 and smashing in her port bow.

The impact was severe, breaking the hawsers. The Southern Cross then backed up to the bow of the McLain No. 2 and the deck hand got a line on the middle of the McLain No. 2, both tug and barge being against the starboard bank. A tarpaulin was placed over the bow of the barge to try to stop the leak but the hole was too big and the bow compartment filled up speedily.

The foregoing version of what took place follows closely the testimony given by LaFontaine, the mate on the Southern Cross, for it seemed to me that he told the most consistent story and appeared to be an honest witness. He estimated the sheer of the Merry at about 20 to 25 degrees across the canal. At the time of the collision the barges were against the starboard bank. The McLain was dragging, just before the crash, on the stone bottom. The point of collision was between 300 and 400 feet west of the east end of the concrete wall.

Otts, who was the captain on the barge McLain No. 2, and Thurston, the captain of the Southern Cross, agree with LaFontaine too that the Arthur H. Merry struck the port side of the Southern Cross bow amidships and from there went back to the head boat, the McLain No. 2, striking her port bow corner. They assert too that the Southern Cross was at the time of the collision and prior thereto on her own starboard side of the canal.

As against the entirely consistent story that the mate of the Southern Cross testified to, the testimony of those on the Brim-

224

stone and her tanker is not convincing. McDonald, the deck hand on the Brimstone, standing at the time of the happening on the bow of the Merry, said that he observed the tail end of the Southern Cross tow swing to the north bank when the two tows were about a thousand feet apart. He then said that the tow straightened up and took a sheer the other way, meaning that the bow sheered to the north. He said that occurred when the Southern Cross tow was only 200 feet away from the Arthur H. Merry; that the sheer was not broken and was the cause of the collision. McDonald also said that at the time of the contact between the Merry and the McLain No. 2, the Southern Cross was approximately 125 feet ahead of the McLain No. 2. This is an obvious error. The credible testimony is that only 25 feet of water separated the stern of the Southern Cross from the bow of the McLain No. 2.

McDonald testified that as the Brimstone passed the easterly end of the concrete wall its engines were working on one bell; that before the collision the engines had stopped and had been stopped from the time the bow of the Arthur H. Merry lapped the concrete wall. He admitted that when the engines are stopped and the tug is pushing a tank barge, the barge will have a tendency to sheer, though, he added, not on all occasions.

The testimony given by McCormick, the mate on the Brimstone, was far from satisfactory. He denied that there was any contact between the Southern Cross and the Arthur H. Merry and said that the Arthur H. Merry was not moving at the time of the contact with the McLain No. 2, having been brought up along the cement wall on the north of the canal for about two or three minutes prior to the contact. At that time he was in the pilot house of the Brimstone. His description of the navigation of the Southern Cross does not conform to the McDonald version, for he said that she was coming down the middle of the canal with her barges over on the south side. Then apparently confused he changed his testimony to say that the McLain was on the north side. He said that after the collision the Southern Cross backed up to the McLain on the starboard side of the McLain. McCormick blew no danger signal, and said he had not stopped his engines until the bow of the Southern Cross had reached the bow of the Merry. He admitted that the current was about a mile or a mile and a

half per hour and that when his engine was stopped he had no control over the tow, as he testified before the local inspectors, though he denied it at the trial. He testified that after he blew a passing signal he kept running for ten minutes before he checked his boat down, though before the local inspectors he said: "I checked down when I blew the whistle. When I blew for the Southern Cross I checked down."

Another witness for the Brimstone was Vedor, a deck hand. He testified that as the Brimstone passed the guard gate he heard a long bend whistle exchanged and then a short whistle and an exchange of short whistles. He said then the Brimstone checked down to one bell and changed its course to the starboard, stopped its engines and drifted along to the wall, staying there until the Southern Cross came down. He said the Southern Cross came down mid-channel and when she got right up to the barge (meaning doubtless the Merry) she started to pull over to the south shore. Speaking of the Southern Cross he said: "and she changed her course toward the south shore; that is, she changed the course, the tug, to throw her stern to port, to throw the tow into the south shore of the canal." At the time of the contact he was on the barge Merry. He too said that the length of the hawsers between the Southern Cross and the head of the tow was about 125 to 150 feet. He said the Southern Cross passed about eight feet off the Merry and that at that time the McLain No. 2 was inside of the Merry. This man said that he went on deck about three minutes before the collision and at that time the Southern Cross was about 200 feet away. If that were the situation it must have taken the Southern Cross about three minutes to travel 200 feet with a mile and a half current in her favor.

I am obliged to accept the testimony of LaFontaine and Otts. On balance too I find that the current does not set against either wall but follows the true course of the canal. The collision arose through the Brimstone's sheer to port. That sheer is explainable by her stopped engines and the mile or mile and a half current acting on the bow of the oil barge.

The Brimstone ascribes fault to the libellant because of the absence of steering wheels on the McLain and Chicago. The weight of the evidence seems to favor the view that in towing loaded barges, particularly on short hawsers, the barges would

follow the tug and as Gibbons, one of the experts, testified: "Well, they always follow it; they go where the tug would go, because the captain, he could not steer the wheel anyway with such a short hawser; it would throw him on the other side of the canal; the tug boat would take the wheel away from the captain." Another experienced canal boat captain, referring to the use of the wheels on the barges, said:

"A. The boats—the wheels were rigged up with sheaves and cables to steer them, but we never used them; I wouldn't use them; anyway, they wouldn't be any good because they are on short hawsers, and one boat might be loaded—they would load one in Utica—they would load them with cranes —they would load two in Utica—well, they would load them so, so that they would be down—the head boat would be down so deep that the second boat with the wheel would ride up on to her, and I would have to reverse them, bow and bow, and to get them even so they would not be riding over each other. We never used the wheels.

"Q. Under those conditions, could you rig your wheel if you wanted to when you were towing? A. No; I couldn't because they would ride over each other, they would knock the stern rail over if I would rig them the way I wanted to."

A decree will be entered holding the Brimstone solely at fault.

■ Following the trial a stipulation signed by all the parties was filed in the consolidated cause from which it appears that at the time of the collision and prior thereto the Brimstone was owned by Steamtug Brimstone, Inc.; that none of the officers of the corporation nor directors was a member of the crew, nor was any of them on board the Brimstone at the time of the collision; that the Brimstone was in the year 1936 a diesel tug not inspected by the United States local inspectors of steam boats and not operated by a certificate issued by such inspectors; that at the time of the commencement of the voyage there were on board a licensed master and a mate, two deck hands, two engineers, two oilers and a cook. This stipulation establishes the claimant's right to limit its liability.

Submit findings of fact and conclusions of law in conformity with the foregoing opinion.