WOOD TOWING CORPORATION v. PACO TANKERS, Inc.

No. 5417.

Circuit Court of Appeals, Fourth Circuit.

Nov. 5, 1945.

Barron F. Black, of Norfolk, Va. (Vandeventer & Black, of Norfolk, Va., on the brief), for appellee and cross-appellant.

John W. Oast, Jr., of Norfolk, Va., for appellant and cross-appellee.

Before SOPER, DOBIE, and NORTHCOTT, Circuit Judges.

NORTHCOTT, Circuit Judge.

This is a libel filed in September 1942, in the District Court of the United States for the Eastern District of Virginia, at Norfolk, by the appellee and cross-appellant, Paco Tankers, Incorporated, owners of the tanker Chilbar against Wood Towing Corporation, appellant and cross-appellee, owners of the tug E. V. McCaulley. The libel claimed damages alleged to have been suffered by the grounding of the tanker Chilbar in the James River charged to have been caused by the fault of the tug McCaulley.

An answer was filed by Wood Towing Corporation in October 1942. A hearing was begun before the judge below in June 1944, evidence was taken and depositions filed, and, the judge handed down a written opinion, made his findings of fact and stated his conclusions of law, holding both the tanker and the tug at fault for the grounding of the tanker and dividing the damages between the libelant and the respondent. An interlocutory decree was entered to this effect. From this action of the court below the respondent appealed and the libellant filed a cross appeal.

As found by the trial judge the facts are as follows. In the early afternoon of April 4, 1941, the Chilbar, a tanker 405 feet long, 51 feet beam and 28.8 feet deep, was proceeding downstream, in the James River, from Drewry's Bluff, Virginia, approaching a bend of approximately 80 degrees, at half speed. She slowed down and blew a one whistle blast when she

passed a dredge in Kingsland Reach more than half a mile from the river bend. After passing the dredge, she resumed half speed, which was about five or six miles an hour, and blew no more signals until she entered the curve of the bend between Kingsland Reach and Aikens Swamp Dutch Gap cut-off. The tug McCaulley was proceeding upstream bound for a gravel pit above the bend. The tug is a vessel 96 feet 5 inches long, 20 feet 5 inches beam and 20 feet 8 inches deep. Her tow consisted of seven empty barges in three tiers of two barges each with the seventh at the tail end of the starboard row. The dimensions of these barges varied in length from 95.2 feet to 118 feet; in beam, from 31.2 feet to 35 feet; and in depth, from 8.1 feet to 10 feet. Their draft was from six inches to one foot and their freeboard was about seven feet. The stern of each barge was about three feet from the bow of the barge following it, and the tow line from the tug to the first barges behind it was at least 35 feet long, with some estimates of its length as high as 360 feet. The channel at the point of the occurrence was 200 feet wide, or perhaps slightly more. The wind was blowing from the southeast at about thirteen miles an hour, but the weather was good. The tide was at the last of ebb and the velocity of the current was six-tenths of a mile per hour.

When the tug rounded the bend at a speed of four or five miles an hour and sighted the tanker coming downstream, the tug blew a one-blast signal for a port to port passage. The vessels were then about 2,000 feet apart, and the tanker, seeing the tug but unaware of the barges, which had not come into sight around the bend, assented to the port to port passage with a one-blast signal. Shortly thereafter the barges came into sight, and the tanker, maintaining half speed, attempted to pass between the barges on her port side and the channel bank on her starboard side. She put her engines at full speed for better steerage when she was about opposite the end of the tow, but nevertheless came into contact with the channel bank and damaged her hull. The tug and tow suffered no damage and proceeded upstream without knowing the tanker had been damaged. Neither vessel sounded any warning signal during the time here involved. So much of the facts is relatively free from dispute, but there is a great conflict in the testimony as to the actual position of the vessels before and during the passage. According to the tanker's witnesses, the tug's tow was tailing across the channel in front of the tanker, with the last barge close to the tanker's starboard side of the channel. The tug's witnesses testified that the tanker was on the wrong side of the channel and that the barges were trailing straight behind the tug and were close to their proper side of the river. The court below found as a fact that after making her sharp turn to starboard to go around the bend the tug, "because of the sharp turn, or the effect of the wind from the southeast which would strike the exposed starboard freeboard of her barges, or improper navigation, or a combination of those causes, allowed her barges to tail across the channel and in the path of the approaching Chilbar." The court concluded that each vessel was at fault in two respects, the tanker in failing to blow a bend whistle and in maintaining half speed as she approached the bend, the tug in failing to control her barges and keep them on her starboard side of the narrow channel and in failing to notify the tanker of the condition of her tow and inviting a port to port passage. The damages to the tanker were ordered divided on the ground that all of these faults contributed to the accident.

It is clear that the barges were tailing across the channel, despite the testimony of the tug's master and mate to the effect that the barges were following straight behind the tug close to their starboard side of the channel and did not tail out in front of the tanker. An exchange of shouts between the two vessels as they approached is testified to by witnesses from both. The pilot of the tanker shouted to the tug to "Haul her over", and understood the tug to answer that she did not have enough power. The tug's mate testified that his answer was that the tanker should hold her own starboard bank, and he further testified that the barges were following the tug perfectly and were alongside the trees on the tug's starboard side of the river bank.

It is urged that the tanker's sighting the tug before the tow came into sight proves the barges were on their starboard side of the channel, but an examination of the charts submitted shows that this contention is not sound. The testimony of the

tug's master and mate cannot be correct in toto, because they further said the tanker passed safely and did not run aground. This is obviously untrue. It seems immaterial whether the length of the tug's hawser was 35 feet or 360 feet. The court below based its conclusions on the assumption that the hawser was 35 feet long, but even if it were no longer than this, the tug and tow had an overall length of over 575 feet.

We come first to consider the question whether the tug was at fault. While rounding a sharp bend in a narrow channel with a tow of the length admitted here, knowing that she was liable to meet an oncoming vessel at any time, it was the duty of the master of the tug to use great care. As found by the judge below, it is in accord with the probabilities, as well as the weight of the evidence, that the barges, constituting the tow of the tug, tailed across the 200-foot channel when the tug turned sharply to the right around the bend with a wind of thirteen miles an hour blowing against the freeboard of the barges in tow, driving them across the channel. As to whether the tow of the tug was actually across the channel blocking it is a subject of conflict in the evidence. We find no reason to disturb the findings of the trial judge on this point.

On sighting the approaching tanker, the master of the tug who knew or should have known the position of his tow, gave no warning to the Chilbar as to the critical situation. This failure on the part of the tug to warn the tanker, simply giving a port to port signal, thereby indicating that everything was clear, constituted negligence.

The giving of the signal by the tug for a port to port passage was clearly misleading.

In The F. W. Wheeler, 6 Cir., 78 F. 824, the court said: That the failure to give notice by alarm whistle of the danger of the situation was gross negligence.

See, The Edna v. Crew, 4 Cir., 202 F. 1021.

In The Hortensius, D.C., 174 F. 272, 278, the court said: "The agreement by signals meant that the tug would keep her tow to the right and if she were not going to be able to do so, she should have signified it by alarm whistles and not have consented." Similarly, in Thames Towboat Co. v. Pennsylvania R. Co., 2 Cir., 165 F. 617, 618, a tug with an unwieldy tow signalled for a port to port passage with another tug and their tows collided. In holding that the tug was at fault in failing to keep her tow in line and in not giving a warning signal to the approaching tug, when the master knew the makeup of his tow, the length of the hawser, the number of barges, etc., the court said: "If danger threatened he should have given an alarm signal, but instead of doing so he gave the usual passing signal, which was a clear intimation to the Aries that no danger of collision was to be apprehended."

We have no difficulty in arriving at the conclusion that the judge was correct in finding the tug at fault.

We now come to the question of whether the tanker was at fault. Under Article 18, Rule V of the Inland Rules, 33 U.S.C.A. § 203, a steam vessel nearing a short bend or curve in the channel where a vessel approaching from the opposite direction cannot be seen for a distance of half a mile is required to give a one-whistle blast when she shall have arrived within half a mile of such curve or bend. This rule was manifestly violated, and the tanker was therefore negligent. It is contended that the failure to blow a proper bend whistle had no effect upon the case because the two vessels sighted one another at only slightly less than a half-mile distance and because even had the tanker sounded the bend whistle and received a reply, she would have known only that there was another vessel approaching and would not, in the absence of danger signals from the tug, have had any intimation that nearly the whole channel was blocked. While the causative effect of the tanker's dereliction is not obvious, the rule is that when a vessel is violating a statutory rule intended to prevent collisions and a disaster occurs, she must show not only "that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148. Lie v. San Francisco & Portland Steamship Co., 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726.

In The P. R. R. No. 32, 2 Cir., 240 F. 118, 120, in which the court, in modifying a decree finding one vessel at fault and holding both were at fault, said: "* * * it was the duty of both tugs to sound a long blast of the whistle on approaching the bend. No. 32 did so. The

Hague did not, and because she did not she is not free from fault." In the instant case while the negligence of the tug in creating a difficult situation and in failing to give warning of it was primarily responsible for the accident, the burden is on the tanker to show that her violation of the statute by not sounding a bend whistle could not have contributed to the accident. This she has failed to do. If she had blown the bend whistle, the tug would have been aware of her approach only a short time before the tug actually sighted her, but this short time might have enabled the tug to correct the condition of her tow or at least to improve the situation by allowing more space for the tanker to pass.

■ While no statutory rule of navigation was violated by the tanker in maintaining half speed in approaching the bend, the finding of the lower court that this speed was excessive under the circumstances and therefore constituted negligence is not unsupported by the evidence and should not be disturbed. It was admitted that the tanker approached the bend at about five or six miles an hour—her half speed—and some estimates of her speed were higher. It is contended by the tanker that this speed was necessary to enable her to negotiate the sharp bend, and it is not suggested that putting her engines at full speed for better steerage as she was passing the end of the tow was negligent. The finding below was based, not on the tanker's speed in the bend, but in approaching the bend, and the tanker maintains that this speed can be said to have contributed to the accident no more than her leaving Drewry's Bluff when she did rather than ten minutes later. But the tanker was an unusually large vessel for that part of the river, she was approaching a sharp and dangerous bend around which she could not see, and she was in a part of the river where tugs towing barges were common. Under these circumstances, she should have exercised a high degree of caution, a degree with which her speed was not consistent. There was testimony from two of the tug's witnesses that half speed for the tanker was excessive when approaching the bend either knowing that another vessel was coming or not knowing whether or not the river was clear.

The tug has made various other allegations of negligence against the tanker, but these do not require any extended discussion. The charge that the tanker was on her port side of the channel because of her effort to overcome a slip to starboard and thereby violated her port to port passing agreement and that she skidded into the bank is against the weight of the evidence. The skidding theory is supported only by the answer of one of the tug's witnesses to a hypothetical question on the steering qualities of a vessel with her bow out of the water and deeply laden aft, and the other testimony was to the contrary. As for the tanker being on her port side of the channel, while the tug's witnesses say she was slightly over on their side, the tanker's witnesses concurred in saying she was in the middle of the channel as she approached the bend and then turned to starboard. The tug also attempts to have inferences of further negligence drawn from her statements that the operation of a vessel the size of the tanker in the upper part of the James River was a new venture undertaken by inexperienced navigators and that the tanker had previously run aground. But the tug has failed to point to any act or omission which could be called negligence other than excessive speed and failure to sound a bend whistle.

This court held in The Ed Luckenbach, 4 Cir., 93 F. 841, 843: " * * * the rule prevails in cases like this that the decree of the trial judge will not be disturbed upon mere questions of fact depending upon the credibility of witnesses who testified before him, unless there is found to be a decided preponderance of the evidence against the same."

We have repeatedly held to the same effect and we know of no authority to the contrary.

See, also, The Ambridge, 4 Cir., 42 F. 2d 971; The Corapeake, 4 Cir., 55 F.2d 228; Virginia Shipbuilding Corp. v. United States, 4 Cir., 22 F.2d 38; The District of Columbia, 4 Cir., 74 F.2d 977, 103 A. L.R. 768.

■ Both vessels were at fault, and the decree ordering a division of damages under well-established principles of admiralty law was proper because the faults of both contributed to the damage sustained by the tanker. Had the tug kept her tow in proper shape, or, failing that, had she warned the tanker of the danger, the passage might have been made without mishap. And on the other hand, had the tanker given a proper bend signal and had she ap-

proached the bend at a more reasonable speed, the tug would have had more time to remedy the condition of her tow. The findings of fact by the District Court are fully supported by the evidence, and the conclusions of law are free from error. The decree appealed from is accordingly affirmed.

Affirmed.