THE ROBERT H. McCRACKEN.

THE EUGENIA M. MORAN.

THE THOMAS E. MORAN, Inc.

THE NOTTINGHAM.

THE NOTTINGHAM, Inc.

No. 17867.

District Court, E. D. New York.

May 2, 1947.

Bigham, Englar, Jones & Houston, of New York City (Charles A. Van Hagen, of New York City, of counsel), for libellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Adrian J. O'Kane, of New York City, of counsel), for Tug Thomas E. Moran, Inc., and Tug Eugenia M. Moran, claimants.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for Steamtug Nottingham, Inc., claimant.

ABRUZZO, District Judge.

This is a suit in admiralty involving a collision which took place on the night of December 12, 1946, at the entrance to Newport Harbor between the barge "Seaboard No. 99," in tow of the tug "Eugenia M. Moran," and the barge "Robert H. McCracken," in tow of the tug "Nottingham."

At the trial it was stipulated that the libellant is entitled to a decree from either the tug "Eugenia M. Moran" or the tug "Nottingham," or both.

The tug "Moran" contends that the "Nottingham" allowed its tow to swing to port so as to come in collision with the "Seaboard No. 99" while the "Nottingham" contends that the oil barge "Seaboard No. 99" was allowed to sheer to port in collision with the barge "McCracken." The place of the collision is not much in dispute, having occurred near what is known as Newport Neck, Rhode Island.

The master of the "Nottingham" testified that he was towing three barges from Providence out to sea, down the Providence River. Of these three barges, the "McCracken" was in the center, the "Cullen No. 17" being the first one, and the "A. J. Kelly" bringing up the rear. There was 1,000 to 1,200 feet of hawser between the first and second barge, and the same length of hawser between the second and third barges. Exhibit 1, the map in evidence, indicates by a blue circle the place where the barge "McCracken" was stranded. The blue "x" indicates where the tug "Nottingham" was when she blew a distress whistle. This captain testified that his tug passed the tug "Moran" safely and, after the barge "Cullen" was safely past the tug "Moran" the captain of the "Moran" maneuvered the barge "Seaboard No. 99" so negligently that the barge "Seaboard" came in contact with and damaged the "McCracken."

Hazel, the captain of the barge "Cullen No. 17," testified that he was the first tow behind the "Nottingham," and that when his barge passed the "Seaboard" there was 300 feet of open water separating them.

If these two witnesses are to be fully believed, the "Seaboard" was allowed to veer to port some 300 feet, or whatever space existed between these flotillas, while the "Nottingham" kept a straight course.

Captain Walling of the "Moran" testified that while he was passing this tow and, having safely passed the tug "Nottingham" and the "Cullen No. 17" with about 150 to 200 feet of water between the two tows, the "McCracken" seemed to sag over into the bow of the "Seaboard"; that at that time he was proceeding in a straight course; and that the sole reason for this collision was the fault of the captain of the "Nottingham" in permitting the "McCracken" to get out of its straight line course and sag over to the "Seaboard."

In determining this disputed question of fact, it is necessary to take into consideration the place where the collision occurred and the conditions existing with respect to wind and tide. The course which each tug would have to follow is important. The "Moran" coming in from sea to Providence would have a fairly straight course. The "Nottingham," proceeding in the opposite direction, when it reached a point called "The Dumplings" would have to somewhat veer its course to port in order to get safely around that point which jutted sharply into the water. This course would have a tendency to throw his barges out of a straight line unless he maneuvered carefully and kept his tow lines taut. The tide was flowing toward Newport Neck which was opposite the point called "The Dumplings." The wind was from the west but not too high.

The "McCracken" had steering apparatus and a wheelsman was at the helm at the time of the collision.

The "Seaboard" had no steering gear, nor was she equipped with skegs or rudders and was being towed on a hawser of 1,200 feet without a bridle.

It is evident that the "Seaboard" would tend to get out of control and once out it would be difficult for the "Moran" captain to immediately get control of the "Seaboard." She had the reputation of sheering. There was at least 150 to 300 feet of open water separating the two tows. The place where the collision occurred is quite narrow and would require careful expert maneuvering for tows to pass each other safely in view of the lengthy hawsers between the tugs and barges.

The captain of the "Moran" testified that when he saw the "Nottingham" and its tow he slowed down.

I am convinced that the "McCracken" to some extent floated out of its straight course toward the "Seaboard," but not the full distance separating these two tows.

This was caused by the nature of the turn to port which the captain of the Nottingham had to make around "The Dumplings," the length of the hawser, and the wind and tide.

I believe the "Seaboard" sheered toward the "McCracken." This was caused by the captain slowing down as he passed the "Nottingham" flotilla, which necessarily would cause the tow line to loosen and, as the "Seaboard" had a tendency to sheer, she floated out of her straight course partly into the open water space between these two tows.

It is difficult for me to believe that the "McCracken" or the "Seaboard" got out of their straight courses to the full extent of the water separating these two tows. It is my belief and the proof so indicates that both the "McCracken" and the "Seaboard" got out of their straight courses and both, therefore, contributed to this collision.

The collision occurred because of the concurrent negligence of the captains of the "Nottingham" and the "Moran."

Submit findings of fact and conclusions of law in accordance with this decision.