YACHTS, Inc., as owner of THE Yacht SUNSET, Libelant,

v.

THE Tug EDWARD F. FARRINGTON, THE Barge CHARLESTON, their engines, tackle, apparel and equipment, and Norfolk, Baltimore & Carolina Line, Inc., Respondents.

No. 274.

United States District Court
E. D. North Carolina,
Elizabeth City Division.

April 2, 1955.

Worth & Horner, Elizabeth City, N. C., Foley & Martin, New York City, for libelant.

Blades & Small, Elizabeth City, N. C., John W. Oast, Jr., Norfolk, Va., for respondents.

GILLIAM, District Judge.

Upon the pleadings, evidence and stipulations of the parties, the Court finds these facts:

1. Libelant, a Delaware corporation, is the owner of the yacht Sunset, a wooden hull vessel 95.9 feet long, 19 feet wide, 9.2 feet deep, with a draft of between 5 and 6 feet, propelled by twin Diesel engines, 200 horsepower each, and twin propellers.

2. Respondent, Norfolk, Baltimore and Carolina Line, Inc., a Virginia corporation, is the owner of the motor vessel Edward F. Farrington and the barge Charleston. The Edward F. Farrington, hereinafter called the tug, is a combination cargo carrying freighter and tow boat, propelled by a 690 horsepower Diesel engine and single screw. She is 123.6 feet long, 30.1 feet wide, 10.2 feet deep, and at the times herein mentioned had a draft of about 10 feet. The Charleston, hereinafter called the barge, is a steel hull former Navy LSN, 191.1 feet long, 33.9 feet wide, 7.9 feet deep, and on the date in question was fully loaded with cargo and had a draft of between 6 and 7 feet. She has a pointed bow, is steered by twin rudders and has no propulsive power.

3. Shortly after 8:00 a. m. on May 29, 1952, the tug was towing the barge on a single 40-foot hawser astern and as proceeding southwardly in the intracoastal Waterway. The yacht was proceeding northwardly in the Waterway, bound for New York. A short distance south of beacon number 90 in or near Price Creek, approximately 19 miles north of Charleston, South Carolina, a collision occurred between the yacht and the barge, doing extensive damage to the yacht and none to the barge.

4. In this immediate area the Waterway channel is 90 feet wide and 12 feet deep. The sides of the dredged channel rise rather sharply from the 12-foot depth to the depth of the surrounding water. The distance between the banks of the stream is variously estimated by witnesses as between 150 and 300 feet. The channel just south of beacon 90 is nearer the western than the eastern bank of the stream. The channel is straight for a considerable distance on either side of beacon 90; it makes a 43-degree turn at the beacon, the turn being to the right for southbound vessels and to the left for northbound vessels. Right at the beacon the channel is widened on its western side, cutting off the inside corner of the bend. In this vicinity the Waterway traverses low marsh land and there is nothing to obstruct the view for several miles. On the morning of the collision the weather was fair and visibility was good.

5. The tug and barge were making approximately 5 or 6 miles per hour as they proceeded southwardly down the center of the Waterway, approaching beacon 90. The yacht's speed was 7½ knots. When both vessels were one-quarter of a mile from the beacon the tug sounded one blast and the yacht answered with a one-whistle signal. The tug slowed to half speed, about four miles per hour, went to her right-hand side of the channel and proceeded around the bend.

6. When the whistle signals were exchanged the yacht, which was in its own, or eastern half of the channel, stopped its propellers, pulled to the right and gradually lost headway.

7. The barge, in tow of the tug, commenced the turn at the beacon. The

tug, hugging the western side of the channel, reduced to slow speed and was moving between one and two miles per hour. The barge hit bottom on its starboard side and sheered to port, its bow crossing over into the eastern half of the channel. The yacht captain, seeing the danger, gave emergency full speed ahead and turned right toward the eastern bank, but hit bottom and was not able to avoid the collision. The port bow of the barge struck the port side of the yacht amidships.

8. The point of collision was a short distance south of beacon 90 and on the eastern side of the mid-channel line of the Waterway channel.

9. Neither the tug nor the yacht sounded danger signals prior to the collision.

### Conclusions of Law

1. The collision was caused by faulty navigation in the following respects:

(a) The barge was at fault in failing to follow the course of the tug, in sheering to port and crossing over into the eastern half of the intracoastal Waterway channel, in violation of the narrow channel rule, 33 U.S.C.A. § 210, which rule is applicable to said channel.

(b) The tug was at fault in failing to control the movements of the barge and in failing either to prevent the barge from sheering or to correct the sheer so that the barge would not cross over into the eastern half of the Waterway channel.

2. The yacht was not at fault.

3. The respondent, Norfolk, Baltimore and Carolina Line, Inc., is liable to libelant for the damages sustained by it as a proximate result of the collision. In the absence of a stipulation of the parties as to the amount of damages, the Court will later determine the amount thereof, together with interest and costs.

### Opinion

Many of the facts in this collision case are either admitted or proven by similar testimony of both parties, but on the crucial issue of exactly where and how the collision occurred there is a strong conflict of evidence, typical of maritime collision cases. Gatewood v. Sanders, 4 Cir., 152 F.2d 379. According to libelant's witnesses, the yacht Sunset was in its own, or eastern half of the intracoastal Waterway, practically against the bank, and the barge Charleston sheered all the way across the channel and struck the yacht's port side. According to respondent's witnesses, the tug Edward F. Farrington was up against the bank on its own, or western side of the Waterway, the barge in tow astern was completely to the west of the mid-channel line, and the yacht proceeded across the center line, just missed the tug and collided with the port bow of the barge.

Naturally, under these circumstances the determination of the true facts is a difficult matter. In finding the facts in libelant's favor the Court has relied in part on certain inferences or deductions from facts which are uncontradicted or not seriously disputed.

Article 25 of the inland Rules, 33 U.S.C.A. § 210, provides that in narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies to its starboard, or right.

The intracoastal Waterway channel in the vicinity of the collision is 90 feet wide, clearly a narrow channel within the rule. Each half of the channel is 45 feet wide. The tug was 30.1 feet wide and the barge was 33.9 feet wide. Thus the tug and tow had a clearance of only 11.1 feet or about 5½ feet on each side, in order to remain within their own half of the channel. The tug captain, with knowledge of this narrow margin of safety, was required to exercise particular skill and care in navigation, especially at bends in the channel and when meeting and passing another vessel. The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126; Petition of Blake, D.C., 285 F. 391; Wood Towing Corporation v. Paco Tankers, Inc., 4

Cir., 152 F.2d 258; The Robert H. Mc-Cracken, D.C., 74 F.Supp. 60.

The evidence is clear that the tug and yacht were approximately equidistant from beacon 90 when the whistle signals were sounded. It is also clear that the yacht stopped to permit the tug and tow to pass. This is shown not only by libelant's witnesses but also by the point of collision with reference to beacon 90. If the yacht had not stopped, but had continued its northward journey at 7½ knots, or even 5 knots, the collision would have occurred north of the beacon rather than a considerable distance to the south thereof. It is highly improbable that the experienced master of the yacht, having decided to stop and wait for the tug and tow to round the bend, would stop on the wrong side of the channel or permit his yacht to drift over on that side. Furthermore, if the yacht had been on the wrong side of the channel the tug captain should have and probably would have sounded four blasts. 33 U.S.C.A. § 203, art. 18, Rule III. The evidence is convincing that the yacht stopped on its own side of the channel and that it did not resume its forward motion until just before the collision.

Indeed, much of respondent's evidence supports this finding. The tug captain and other witnesses testified that the tug rounded the bend within its own half of the channel and pulled over to the right as far as it could go until it was "dragging", "hitting" or "scrubbing" bottom along the western side. Both the Corps of Engineers and the U.S.C. & G. charts show that the dredged channel lies close to the western bank of the stream at this point. There is also testimony that the bank slants upward from the bottom rather sharply. Under the circumstances it is apparent that the tug, with a 10-foot draft, could not have proceeded more than a few feet outside the 12-foot channel without hitting bottom.

Respondent's witnesses Gaskill, Lewis and Midgette all admit that the barge was to the left of the tug from 10 to 20 feet. Keeping in mind the narrow channel and the broad beam of the tug and the barge, it is clear from all the evidence that the barge's port bow was well across the center line of the channel at the time of the collision.

It was the duty of the barge to follow the course of the tug at all times. P. Dougherty Co. v. United States, 3 Cir., 207 F.2d 626, certiorari denied, 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1068; The Henry W. Card, D.C., 7 F.Supp. 324, affirmed per curiam, 2 Cir., 79 F.2d 1019. If the barge had followed directly behind the towing vessel there would have been no collision. The real cause of the collision was the barge's sheer to port after it struck bottom on the western side of the channel.

Sheering in itself raises a presumption that the barge was not being properly handled. The Eureka No. 91, D.C., 67 F.Supp. 101. The helmsman, Rivers, was on his first trip on the barge, and he had not navigated vessels by this point before. He described the barge as a hard steering vessel, slow to answer the helm. Whether due to inexperience or negligence of the helmsman or to poor navigation and control on the part of the tug, the fact is that the barge sheered to port and struck the yacht, and in the absence of evidence that the sheer was unavoidable, te liability of the tug and tow is established. Indian Ridge Canning Co. v. The Captain Nick, et al., D.C., 98 F.Supp. 664; The McLain No. 2, D.C., 32 F.Supp. 222; The Interwaterways No. 101, 2 Cir., 25 F.2d 913.

At the time the barge touched bottom on her starboard side, the tug was making slow speed, not more than one or two miles per hour, and the towing hawser had slackened. When the barge sheered, the helmsman could not bring her back to the right because the slow movement of his vessel affected his rudder control, the tug's propeller wash was against his starboard bow, and the lack of tension and pull on the hawser permitted his bow to swing too far to port. From the facts it is obvious that the tug did not fulfill its duty to control the tow and keep it straight behind it. Tank-

er Hygrade No. 24, Inc., v. The Dynamic, 2 Cir., 213 F.2d 453. In a case with facts very similar to this one, the tug was held solely at fault for a collision between its tow and a steamer passing in the opposite direction. Mathieson Chemical Corp. v. The Sadie, D.C., 95 F.Supp. 221.

The yacht was not at fault. While it was under a duty to keep out of the way of the tug encumbered with the tow, yet it was not bound to anticipate negligent maneuvers on the part of the tug and barge or a violation of the rules of navigation. The Alabama, 4 Cir., 126 F. 332, certiorari denied, 193 U.S. 669 24 S.Ct. 851, 48 L.Ed. 840. When the port to port passing signals were given, the yacht had a right to rely on the tug's agreement that she and the barge would keep to their own side of the channel and would stay out of the yacht's path. The Sulphite, D.C., 73 F. Supp. 137.

An interlocutory decree will be entered in favor of libelant.