BALTIMORE STEAM PACKET COMPANY, Owner and Operator of the Steamship City of Norfolk, Libellant,

v.

THE CIUDAD DE MARACAIBO, her engines and boilers, etc., and her Owner Compania Anonima Venezolana De Navegacion, Respondent.

COMPANIA ANONIMA VENEZOLANA DE NAVEGACION, Owner of the Steamship Ciudad De Maracaibo, Cross Libellant,

v.

THE CITY OF NORFOLK, her engines, etc., and Baltimore Steam Packet Company, Cross Respondent.

No. 3695.

United States District Court
D. Maryland, Admiralty Division.

July 2, 1956.

Karl F. Steinmann and Terrence E. Burke, Baltimore, Md., proctors for libellant and cross-respondent.

Robert H. Williams, Jr., Baltimore, Md., and Renato C. Giallorenzi, New York City, proctors for respondent and cross-libellant.

THOMSEN, Chief Judge.

The City of Norfolk, a bay boat carrying passengers and freight, south bound from Baltimore to Norfolk, collided with the Ciudad De Maracaibo, a Venezuelan freighter, north bound for Baltimore, in the Craighill Channel of the Chesapeake Bay on October 5, 1954, at 8:10 or 8:11 p. m. Each ship charges the other with fault.

The Craighill Channel, 2.8 miles long and 600 feet wide, runs almost due north and south near the western shore of the Bay, between the mouths of the Patapsco and Magothy Rivers. The northern limit of the Craighill Channel is marked by two buoys, 13 C on the west side and 14

C on the east, the southern limit by 5 C on the west and 6 C on the east.

The approach to the Craighill Channel from the northwest is through the Craighill Angle, which connects with the Cutoff Channel south of Sevenfoot Knoll. The approach from the south is through the Craighill Entrance, a funnel shaped channel which opens wide to the south 1.5 miles south by east of the southern end of the Craighill Channel.

The Norfolk is a passenger and cargo vessel, steam propelled, with a steel hull and wooden superstructure, 2,379 gross tons, 297.5 feet in length. She was carrying 100 passengers and 620 tons of cargo. Her draft on departure from Baltimore was 11′ 11″ forward, 15′ 6″ aft. Her full speed is 14 knots.

The Maracaibo is a steel, diesel propelled dry cargo vessel of 3,940 gross tons, 420 feet in length. She was in partial ballast and had about 120 tons of dry cargo on board. Her draft was 9′ 10″ forward, 13′ 10″ aft. Her full speed is 15 knots.

It was dark at the time of the collision, but the visibility was good. The tide was three-quarters flood, and there was a light wind from the northeast.

There was more than the usual conflict in the evidence, not only between the witnesses for the Norfolk and for the Maracaibo respectively, but among the witnesses for each side, and between the witnesses and the logs. Each side presented a theory which I find incredible. Counsel for the Maracaibo would have us believe that the Norfolk cut to the east directly in front of the Maracaibo, intending to run outside the Craighill Channel, risking lumps and shoals as well as a collision, in order to cut so slight a corner that less than 10 seconds would have been saved. This theory is supported by some testimony, principally that of the Maracaibo's pilot, who told one story at the Coast Guard hearing and two others in court, and whose testimony in this case I find unworthy of belief.

The Norfolk's theory is also incredible. Her counsel would have us believe that the Maracaibo entered the Craighill Channel from the south, steadied up on her side, showing her red light to the Norfolk, then, for no reason, turned west across the channel in the path of the Norfolk, blowing an inappropriate single blast indicating an intention to pass port to port, and ran outside the channel to the west before turning sharp right directly in front of the Norfolk.

I am unable to accept either of these theories. The findings of fact, set out below, are based upon and supported by entries against interest in the logs; the testimony of the master and lookout of the Red Star, a vessel connected with neither party, which was preceding the Norfolk down the channel; the testimony and depositions of the other witnesses, most of whom appeared before me; and inferences which may reasonably be drawn therefrom.

The Norfolk left Baltimore at 6:35 p. m., five minutes late, passed Sevenfoot Knoll at 7:50, ten minutes late, hauled 13 C at 7:59, and set her course S ½ point W, which is directly down the Craighill Channel, keeping to her right (west) side of the channel. At 8:00 the Maracaibo was proceeding NNW up the Craighill Entrance. She hauled 6 C probably about 8:05 or 8:06, so far to the west of the buoy that she forced the Red Star, which steered badly, to go outside the channel to the west and pass 5 C on her (Red Star's) port in order to avoid danger of collision. I find that the Maracaibo continued on a course west of north, into the west, or south bound, side of the Craighill Channel. Her deck log states, in the agreed translation, that at 8:05 the pilot ordered "rudder to starboard for the purpose of keeping to the right side of the channel", and two minutes later "noticing that the ferry (sic) was falling to port the Pilot ordered rudder very hard to starboard (full rudder to starboard) sounding the whistle according to regulations and ordering immediately full

speed reverse * * * repeating again the whistle signal meaning 'falling to starboard'." The bell-book confirms the order "Toda atras" at 8:07. I find as a fact that the Maracaibo made these turns, gave these signals and reversed its engines, but a little later than the logs show, and not because the Norfolk was "falling to port". It requires 1½ minutes for the Maracaibo to change its propeller from full speed ahead to full speed reverse; the Norfolk, with a reciprocating engine, can accomplish this in ½ minute.

The action of the Maracaibo in continuing her northwesterly course and delaying too long her return to her proper side of the channel may have been due to the fact that the orders of the English-speaking pilot had to be translated to her Venezuelan helmsman by her Spanish mate, whose command of English was not perfect.

█ I find that the captain of the Norfolk was naturally bewildered by the single blast from the Maracaibo while she was still on a course west of north on one side or the other of the western boundary of the Craighill Channel. The order to place the Norfolk full speed astern was given at least as soon as the similar order on the Maracaibo, and went into effect at least a minute earlier. Both ships had been running around 12 to 14 knots, so the Norfolk slowed down more quickly than the Maracaibo. The Maracaibo cut sharp right, toward the east, in front of the Norfolk one minute, more or less, before the collision. The wind and the reversal of her engines swung the Maracaibo around fairly sharply, and the ships collided somewhere in the west half of the Craighill Channel, the bow of the Norfolk striking the port side of the Maracaibo about 100 feet from her bow.

Counsel for the Maracaibo rely on the photographs of the damage to both vessels and the testimony of Dmitri Antippas, a marine engineer with some experience in repairing vessels, to support their contention that the Norfolk was turning to port at the time of the colli-sion, and that the ships came together at an acute angle, both bows facing more or less easterly. The photographs are consistent with this theory except, possibly, that more scraping on the adjacent sides of the two ships would have been expected; but they are not necessarily inconsistent with the testimony of the Norfolk's witnesses, supported by the diagram made by the Maracaibo's captain at the Coast Guard hearing, that the Norfolk's bow was facing generally south and the Maracaibo's bow generally northeast at the time of impact. The highest point of the Norfolk's bow struck the Maracaibo first, and the lower portions of the bow came into contact with lower portions of the Maracaibo's hull a little further aft. The bend to the left of the Norfolk's bow is not conclusive in favor of the Maracaibo's theory, in view of the considerably greater speed of the Maracaibo at the moment of impact. And even if the Norfolk, besides reversing her engines, had taken mild evasive action by turning toward the east while the Maracaibo was headed west of the Norfolk, and had not had time to resume her course after the Maracaibo changed her direction toward the east, that would not be negligence on the part of the Norfolk under all the circumstances.

The Norfolk was not negligent in responding with a danger signal when the Maracaibo gave her first single blast, indicating a port to port passage while it was in fact bearing to port, making a port to port passage impossible. Nor was the Norfolk negligent in failing to turn west out of the channel, since that was the direction the Maracaibo was headed until shortly before the collision.

█ Whether the captain of the Norfolk ordered her engines reversed as promptly as he should is a more difficult question. The evidence with respect to time is unsatisfactory. The testimony of the master of the Norfolk that the Maracaibo opened her red light after hauling 6 C and then turned to the west, closed her red light, and opened her green light, is probably a rationalization

to fill up the period before he noticed that the Maracaibo was ½ mile in front of him showing only a green light. When all of the circumstances are considered however, I do not believe that the captain of the Norfolk delayed ordering her engines reversed longer than a reasonably prudent man would have done. The narrow channel rule, 33 U.S. C.A. 210, Article 25, required the Maracaibo to keep to that side of the fairway or mid-channel which lay to her starboard; and the captain of the Norfolk was entitled to assume that she would do so until it was or should have been apparent to him that she was going to come up the wrong side of the channel.

 In Yachts, Inc. v. The Edward F. Farrington, D.C.E.D.N.C., 130 F. Supp. 542, at page 546, affirmed sub nom. Norfolk, Baltimore & Carolina Line v. Yachts, Inc., 4 Cir., 226 F.2d 855, dealing with a collision which occurred on the yacht's side of a narrow channel, Judge Gilliam said:

"The yacht was not at fault. While it was under a duty to keep out of the way of the tug encumbered with the tow, yet it was not bound to anticipate negligent maneuvers on the part of the tug and barge or a violation of the rules of navigation. The Alabama, 4 Cir., 126 F. 332, certiorari denied, 193 U.S. 669, 24 S.Ct. 851, 48 L.Ed. 840."

In The Victory (The Plymothian), 168 U.S. 410, at page 423, 18 S.Ct. 149, at page 155, 42 L.Ed. 519, Chief Justice Fuller said:

"As between these vessels, the fault of the Victory being obvious and inexcusable, the evidence to establish fault on the part of the Plymothian must be clear and convincing, in order to make a case for apportionment. The burden of proof is upon each vessel to establish fault on the part of the other.

"The recognized doctrine is thus stated by Mr. Justice Brown in The Umbria, 166 U.S. 404, 409, 17 S.Ct.

610 [41 L.Ed. 1053, 1057]: 'Indeed, so gross was the fault of the Umbria in this connection that we should unhesitatingly apply the rule laid down in The City of New York [Alexandre v. Machan], 147 U.S. 72, 85, 13 S.Ct. 211 [37 L.Ed. 84, 90], and The Ludvig Holberg, 157 U.S. 60, 71, 15 S.Ct. 477 [39 L.Ed. 620, 624], that any doubts regarding the management of the other vessel, or the contribution of her faults, if any, to the collision, should be resolved in her favor'."

I find the Maracaibo solely at fault.

It was agreed at a pretrial conference that the proof of damages should abide the determination of liability. An interlocutory decree will be entered in favor of libellant.