## THE HOWARD.

### (District Court, D. Maryland. June 10, 1916.)

**1. COLLISION ⚙═61—STEAMER AND BARGE—FAULT OF OVERTAKING VESSEL.**

An overtaking steamer, which, several miles off Point Judith, on a clear night, ran into a barge, with lights set, in tow of tug, *held* at fault; her navigator's attention having been fixed on another vessel, till too late to avoid the collision, and she having shortly before changed her course.

**2. COLLISION ⚙═61—FAULT OF TUG WITH LONG HAWSER—EXERCISE OF JUDGMENT.**

The rules allowing use, from Race Rock to Gay Head, of a hawser longer than 75 fathoms, when in the judgment of the tug's master, in view of wind and weather conditions, safety requires, he should not be held in fault, in an honest exercise of that judgment, relative to collision of steamer with one of barges in tow of tug.

**3. COLLISION ⚙═58—TUG WITH LONG HAWSER—CARE REQUIRED.**

Use by tug, with barges in tow, of hawsers longer than generally permitted by the rules, requires exercise by it of extreme care in navigation to avoid collision.

**4. COLLISION ⚙═16, 61—VESSEL AT FAULT—OFFICER WITHOUT AUTHORITY.**

No vessel, and least of all, one which, with tows, occupies half a mile of sea room, should be left in charge of an officer who is not allowed to exercise what skill and competency he has, and for such fault, if possibly contributing to a collision, she must be held in part responsible.

**5. COLLISION ⚙═76—DUTY TO WARN—OVERTAKEN VESSEL.**

A tug, with barges in tow, seeing that an overtaking steamer is likely to run into one of the barges, is not without duty to sound danger signals, merely because the steamer has not sounded passing signals.

**6. COLLISION ⚙═58—DUTY OF OVERTAKEN TUG—PRESERVING COURSE AND SPEED.**

The captain of a tug, with two barges in tow, the first of which was struck by an overtaking steamer, though supposing the steamer was likely to pass between the barges, was under the duty of the privileged vessel of preserving course and speed, and was in fault in slowing engines to let hawsers sink.

**7. COLLISION ⚙═108—FAULT—EMERGENCY.**

Act of captain of overtaken tug in slowing engines will not be excused, on ground of emergency, because he had just come from below, but will be judged as if he, or some one free to exercise a free and independent judgment, had been in charge of navigation when danger first appeared.

⚙═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suits for collision by the Consolidation Coastwise Company and the Consolidation Coal Company against the steamship Howard, and by the Merchants' & Miners' Transportation Company against the Consolidation Coastwise Company. Damages divided.

Keech, Wright & Lord, J. Walter Lord, and Robert R. Carman, all of Baltimore, Md., for Consolidation Coastwise Co. and Consolidation Coal Co.

Daniel H. Hayne, of Baltimore, Md., for The Howard and Merchants' & Miners' Transp. Co.

ROSE, District Judge. A very few minutes after 4 o'clock on the morning of the 4th of February last the steamship Howard, when some 3½ miles southeast of Point Judith, was in collision with a barge known as No. 12. The barge sank almost immediately. It and its cargo of 1,447 tons of coal were lost. Of its crew of five, three were drowned.

[1] The Howard was one of the steamers of the Merchants' & Miners' Transportation Company, and at the time of the disaster was on one of its regular trips from Baltimore to Providence. The barge, together with another, No. 17, was in tow of the steamship Charles F. Mayer, and was bound from Hampton Roads to Boston and Portsmouth. The Mayer and both the barges belonged to the Consolidation Coastwise Company. All three were loaded with coal, which was the property of the Consolidation Coal Company. The barges were arranged in tandem fashion. The one which was sunk followed next after the Mayer, and barge No. 17 brought up the rear. Each barge had from 165 to 185 fathoms of hawser out. The Mayer was some 236 feet long; each of the barges, a trifle over 200 feet. There was therefore about half a mile between the stem of the Mayer and the stern of barge 17. The wind was from the northwest, the night was clear, and the required lights were burning on all the vessels concerned.

It is true that the Howard says that the white lights of the rear barge were not as bright as the law requires. The witness Hamilton was the first officer of the steamship Dimmick. It was west bound and passed the Mayer and her tow on an almost parallel course a few minutes before the collision. He says he remembers looking for the white lights of the rear barge, and that he did not see them until his steamer reached or passed barge 12. He thinks the Dimmick came within a few hundred feet of barge 17, but he frankly adds that it is hard to judge distances accurately, especially at night. If the Dimmick passed as close to the Point Judith gas buoy as he says she did, she could not have come within half a mile of the barge.

Another apparently disinterested witness was navigating the tug Western. It was following some three or four miles behind the Mayer and her barges. He had no difficulty in keeping the white lights of barge 17 steadily in view. There is no sufficient reason to believe that the lights on that barge were any less bright than they should have been.

At the time of the collision the Howard was the overtaking, and therefore the burdened, vessel, and, moreover, she changed her course

not very long before she struck the barge. With one possible exception, no one on the Howard saw before the collision any of the lights on any of the three vessels of the Mayer fleet. Indeed, until a collision had become inevitable, nobody on the Howard knew that the Mayer or the barges were anywhere in the neighborhood. It is impossible to believe that all the lights that should have been visible on the Mayer and its barges were obscured by sails. The only reason to suppose that any of them were is that perhaps no one on the Howard saw them.

The story told by witnesses for the latter deprives that circumstance of all probative force. Her watch changed at 4 o'clock. The collision, according to the clock in her pilot house, took place at 5 minutes after 4. The officer in charge came on duty a minute or so before 4. Quartermasters were changed somewhat later, the witnesses say, only a minute or so before the collision. It was after the new quartermaster had received the course from his predecessor that the navigating officer first noticed the lights of the Dimmick, which were never reported by the Howard's lookout, if indeed they were ever seen by him, although either her lights or those of the Mayer were noticed by the quartermaster who went off duty just before the collision. It is evident from the testimony of the Howard's officer that, when he first caught sight of the Dimmick's red light, he was startled by what appeared to him to be her dangerous proximity. He gave the order "hard aport," and watched her until he saw he was going to clear her safely. It was not until then that he saw the sails of the barge. He at once gave the order to slow engines, and instantly followed it by another order to put them at full speed astern. It was too late. The stem of the Howard cut into the barge from her forerigging to her boiler hatch.

It is not necessary to assume the precise accuracy of the estimates of time made by those in the pilot house of the Howard. It appears probable that the Howard was not quite as close to the Dimmick as the former's navigator thought, but it is quite clear that he was alarmed by the appearance of the Dimmick, and that he kept his attention riveted on her until it was too late to avoid striking the barge. The fault of the Howard is clear, and need not be further elaborated. It may be explained, but not justified, by the fact that the change of watch had just been made.

[2] Is the Mayer also to blame? The rules require that ordinarily there shall not be more than 75 fathoms of hawser out, but it is expressly provided that from Race Rock to Gay Head longer hawsers may be used, when in the judgment of the master, in view of the wind and weather conditions, safety requires. A great deal of testimony had been taken as to what those conditions were at the time of the collision and immediately preceding it. The weather records show that at Block Island the wind was then blowing from 26 to 27 miles an hour. The witnesses differ widely as to how strong the wind was in the neighborhood of the place of the collision. There are disinterested witnesses on both sides, and they differ as widely as do those more nearly involved in the controversy. Such as testify for the libelants vary from 20 to 35 miles an hour in their estimates of the wind's ve-

locity. The respondent's witnesses testify it did not exceed 15. The latter say that the sea was smooth.

There is no question that after the collision the Howard's lifeboats were lowered without difficulty and without bumping against the sides of the vessel. They found it both safe and easy to row about in search of the crew of the sunken barge. On the other hand, the libelants put on the stand a number of tugboat captains not in their employ. They all unite in testifying that weather conditions were such that it would not have been safe to tow on a short hawser. The rules impose upon the captain of a tug the duty of deciding whether weather conditions in this locality require at any particular time the use of a hawser exceeding 75 fathoms in length. That judgment must be exercised in good faith, but I see no reason to doubt that the captain of the Mayer did believe that under the weather conditions as he conceived them to be, a long hawser was required.

Now, it is true that tugboat captains assume that in these waters it is never safe to use a short hawser. It may be that that judgment is largely influenced by the fact that the use of a long hawser makes their work easier. Nevertheless, the rules leave to the determination of the captain of the tug the length of the hawser which safety requires. It is obviously unfair to hold him in fault for an honest exercise of that judgment. Moreover, in this case the length of the hawser is of little or no importance. If it had been 20 or 30 fathoms longer than it was, there would have been no collision. If it had been 40 or 50 fathoms shorter, the boats would equally have escaped coming together. Had it been half as long as it was, the Howard would have collided with barge 17, and not with barge 12. After all, that is merely another way of saying that, if the barge had not been precisely where it was when the Howard struck it, it would not have been hit.

[3] I do not for a moment wish to minimize the importance of strict adherence to the rules requiring the use of short hawsers. As already stated, there was half a mile between the bow of the Mayer and the stern of barge 17. Tows of such length are doubly dangerous. They close for the time being a great stretch of water to other vessels, and it is exceedingly difficult for a tug with such a tow so to maneuver as to do its part in escaping from dangerous situations, or from situations which may easily become dangerous. The exercise of extreme care is, under such circumstances, incumbent upon it. The Admiral Schley, 131 Fed. 433, 65 C. C. A. 417.

[4] It is charged that the navigation of the Mayer was not in competent hands. None of her officers, other than her master, were licensed pilots for the waters in which she was. All of them were apparently competent navigators, quite capable of handling the ship under any circumstances in which an accurate knowledge of local conditions was not required. It is equally true that such conditions had nothing to do with this collision. It was in another way that their lack of pilot qualifications embarrassed the navigation of the ship. Because their captain knew they were without pilot licenses, he prescribed the ship's course, and gave them instructions to call him if it became necessary

to change it, or to do anything at all out of the ordinary. Then he went to his room, largely undressed, went to bed, and perhaps to sleep. The third officer came on duty in the pilot house at the change of watch about 4 a. m. He noticed the alteration in the course of the Howard, and became fearful that she would collide with barge 17. He sounded no danger or other signals. Indeed, it is one of the peculiarities of this case that until after the collision no signals were sounded by any of the craft concerned. He did nothing but call the captain, telling him that a steamship was about to run into the stern barge. The captain emerged in his underclothing and saw the Howard showing a green light. He thought she was to the starboard of the stern barge and about abeam of her, and that she was swinging under her port helm. He put his own helm to starboard. so he could get off at an angle and better see what was going on behind him. It looked to him as if the Howard was about to pass between the two barges. He ordered his engines slowed, so that the hawser might sink and the Howard pass over it without parting it. It was not until after the Howard showed her red light, and appeared to be going off to the southward and eastward of his course, that he blew any signal, and that was not intended for the Howard, but was a direction to his own barges to pay attention and follow the lead of the Mayer. In point of fact the collision must have occurred before he saw the Howard's red light. That could not have been visible from the Mayer until the Howard, after striking barge 12, drew off from it.

It goes without saying that no vessel, and least of all none which with her tows occupies half a mile of sea room, should be left in charge of an officer who is not allowed to exercise whatever skill and competency he has. In this the Mayer was in fault, and, if it is possible that such fault contributed to the collision, she must be held in part responsible for it.

[5, 6] The Howard insists that the Mayer should have blown danger signals so soon as it appeared to those in the pilot house of the Mayer that there was any chance of a collision. The Mayer replies that the obligation to sound danger signals is by the rules imposed on the overtaken vessel only where the overtaking vessel has first sounded passing signals, and the overtaken vessel believes that the maneuver indicated will be dangerous. The Howard answers that the Mayer was expressly required not to ignore any precaution which might be required by the ordinary practice of the seamen, or by the special circumstances of the case. It says that it has always been the ordinary practice of seamen, and for that matter of everybody else, to do all in their power to warn one who appears about to run into them. The Mayer answers that at the earliest moment at which there was any reason to sound such signal it would have been too late to have prevented the collision. That may be true, and if the statements of those in the pilot house of the Howard as to the shortness of the time which elapsed between its helm being put hard aport, and the collision, are correct, it is true. On the other hand, according to the testimony from the Mayer's pilot house, the officer in charge saw the Howard getting into a dangerous position with reference to the rear barge. He

called the captain, who came out of his stateroom, looked back, formed an idea, correct or incorrect, as to the situation, threw the head of his vessel to port, and slowed down his engines, all before the collision took place.

Under these circumstances it is impossible to be certain that the prompt sounding by the officer in the pilot house of the Mayer of a danger signal might not have attracted the attention of the Howard in time to have prevented the collision. It was the obvious and natural thing to do, and doubtless would have been done, had not the third officer of the Mayer had his mind on calling his captain. But, if there could be any doubt as to whether the Mayer should be held liable for this act of omission, there would seem to be none that she is blameworthy for doing what the captain did. If, as he supposed, the Howard was likely to pass between the two barges, he took a great risk in slowing down. His was the privileged vessel, but it was under the corresponding duty of preserving its course and speed. It was far better to have a hawser cut than to have a barge sunk. As an experienced navigator he must have known that it was almost impossible for him, from his position, to determine accurately the relative positions and speed of the Howard and the barge. Instead of saving the hawser, what he did may have resulted in losing a barge, its contents, and three lives besides. It is true, as argued by the Mayer, that it may be the collision would have happened, had not the Mayer's engines been slowed down, but on such a question it is impossible to be certain.

[7] The captain of the Mayer did what he should not have done, and what he did may have contributed to the collision, and he must be held liable. It is said that, if he made a mistake, it was in extremis. He was attempting to escape from a danger which was not of his making. Had he, or some one else free to exercise a competent and independent judgment, been in charge of the navigation of the Mayer when danger first manifested itself, there would have been more time to think and to act wisely. He must be held responsible for what he did, precisely as if he had been in the pilot house all the time. If slowing the engines was ever a wise thing to do, it should have been done when it looked like the Howard was about to run into the rear barge; but in point of fact, under all the circumstances of this case, the obligation of the Mayer to maintain her speed was more than usually imperative. The Mayer must therefore be held also in fault. I am not prepared to hold, as the Howard asks, that the sunken barge was also blameworthy.

It follows that the damage done by the collision must be divided between the Howard and the Mayer. If the parties cannot agree as to the amounts, a reference will be ordered.