**DET FORENEDE DAMPSKIBS–SELSKAB, A/S, v. THE EXCALIBUR.**

Petition of DET FORENEDE DAMPSKIBS–SELSKAB, A/S.

**THE COLOMBIA.**

Nos. A–19512, A–19523.

United States District Court
E. D. New York.

Oct. 29, 1952.

by James M. Estabrook, W. P. Sedgwick and Walter A. Darby, Jr., New York City, advocates.

Bigham, Englar, Jones & Houston, New York City, proctors for certain claimants of cargo on the S.S. Excalibur, by Richard F. Shaw and Donald M. Waesche, Jr., New York City, advocates.

Frank J. Parker, Brooklyn, N. Y., proctor for certain claimants of cargo on S.S. Excalibur, by Louis E. Greco and Ruth K. Kearney, New York City, advocates.

Paul C. Matthews, New York City, proctor for Dante Tognini, claimant of cargo on S.S. Excalibur, by John J. Robinson, New York City, advocate.

Dow & Symmers, New York City, proctors for claimants of cargo on S.S. Excalibur, Nello Chiti and B. L. Tadros, by D. Stonebridge, New York City, advocate.

Wechsler & Solodar, New York City, proctors for passenger claimants on S.S. Excalibur, by Albert L. Solodar, New York City, advocate.

RAYFIEL, District Judge.

Det Forenede Dampskibs-Selskab, A/S, as owner of the Colombia, and as bailee of her cargo, filed a libel against The Excalibur and her owner, American Export Lines, Inc., to recover the damages to her hull and cargo resulting from a collision between the two vessels. Thereafter the above-named respondent filed its libel against The Colombia and her owners to recover the damages which were sustained by The Excalibur as a result of the said collision. The libelant then filed its petition for exoneration from or limitation of liability. The claims of the owners of both vessels and of the cargoes carried by them at the time of the collision are covered by either the libelant's suit or the limitation proceeding. Without objection the two cases were tried together.

Kirlin, Campbell & Keating, New York City, proctors for Motorship Colombia, by Harold B. Finn and Elmer C. Maddy, New York City, advocates.

Haight, Deming, Gardner, Poor & Havens, New York City, proctors for claimant,

The Colombia, a single screw steel cargo vessel, with accomodations for some passengers, is about 416 feet long, 57 feet beam, 24 feet depth, 5,146 gross and 2,978 net tons register.

The Excalibur, a single screw steel combination passenger and cargo vessel, is

about 452 feet long, 68 feet beam, 29 feet depth, 9,644 gross and 6,190 net tons register.

The Colombia was under the command of Captain Mikkelsen and was being directed by Pilot Jones, a licensed Sandy Hook pilot. The Excalibur was under the command of Captain Groves and was being directed by Pilot Beinert, also a licensed Sandy Hook pilot.

The collision between the vessels occurred at about 12:33 P.M. Eastern daylight saving time, on June 27, 1950, in the Main Ship Channel, at a point off Bay Ridge, Brooklyn, New York, several hundred yards northwest of the Junction Buoy. The Main Ship Channel is a chartered channel running from the mouth of the Hudson River, on the north and northeast, to the Narrows, on the south.

The weather was clear, the visibility excellent, the wind light, from the south, and the tide was ebbing at about 2 knots.

Reconstructing from the testimony, as I believed it, and the documentary evidence, the movements of the vessels involved and the events which occurred prior to the collision this is what happened.

Shortly after noon on June 27, 1950, The Colombia, inbound from Philadelphia, and headed for Pier 24, Brooklyn, passed through the Narrows, leading into New York Harbor. At about the same time The Excalibur, having left Pier D, Jersey City for Mediterranean ports, was headed toward the Narrows.

The Colombia, under the direction of Pilot Jones, passed through the Narrows, entered the channel, and proceeded along the starboard or Bay Ridge side thereof, following a course considerably east of mid-channel. Her speed was about 12 knots, but owing to the aforementioned ebb tide she was traveling over the bottom at about 10 knots.

The Excalibur was then proceeding on her starboard (the westerly) side of the channel, the course usually followed by outbound vessels proceeding to the Narrows. Her speed was also about 12 knots but due to the said ebb tide she was traveling over the bottom at about 14 knots.

Just before The Excalibur reached Robbins Reef, in the upper harbor, where outbound vessels turn to port slightly to continue their course down the west or Staten Island side of the channel, Pilot Beinert first observed The Colombia, which at that time was entering the Narrows. At about the same time Pilot Jones observed The Excalibur for the first time. The ships were about three miles apart at the time. Their aggregate speed was about 24 knots.

When The Colombia passed through the Narrows she altered her course slightly to starboard so as to conform to the east channel line formed by the aforementioned Junction Buoy and Buoy 24, sometimes called the Owl's Head Buoy.

■ When The Excalibur reached a point approximately abeam of Robbins Reef it began a slow swing to port, which was the usual maneuver for outbound vessels, but, instead of straightening her course to continue down her starboard (the Staten Island) side of the channel, she continued to swing to port until she was amost dead ahead of The Colombia, even showing, as Pilot Jones testified, "a little bit of her starboard side" and finally crossed over to the east or Brooklyn side of the channel. That was the first of the navigational faults committed by The Excalibur, since the Narrow Channel Rule, 33 U.S.C.A. § 210,—there is ample authority for holding that the waters herein involved constitute a narrow channel —required her, since it was safe and practicable so to do, to keep to her starboard side of the channel. Beinert testified that Captain Groves, the master of The Excalibur, had asked him to keep as close to Brooklyn as he could so that he might salute his home as he was going by.

In the La Bretagne case, 179 F. 286, 287, the Court of Appeals of this circuit, referring to the Main Ship Channel extending from Governor's Island to the Narrows, said: "It is a well-known channel, charted and buoyed, and a steam vessel navigating it should follow the rule which requires her 'when it is safe and practicable' to keep

to that side of the fairway or mid-channel which lies on her starboard side." See also The Bilbster, 2 Cir., 6 F.2d 954.

Shortly thereafter The Excalibur gave a two-blast signal calling for a starboard to starboard crossing. Pilot Jones answered with his own two-blast signal and believing, because of The Excalibur's crossing to the east side of the channel, that she was headed for a Brooklyn pier, he altered the Colombia's course to port.

Those in charge of the navigation of The Excalibur, denying that they heard any reply from The Colombia, claim that none was made. It may be that they did not hear the reply, for they testified that at that time they were in the wheelhouse, the windows of which were closed. However, the Colombia's reply signal must have been given because it was heard by the pilot of a ferryboat which was crossing from Staten Island to Bay Ridge at the time.

■ If the navigators of The Excalibur did not hear The Colombia's reply and were uncertain of her intention, they could have repeated the signal, and, having failed to do so, it was their duty to sound the "alarm" signal, consisting of at least four short and rapid blasts; as required by the rules 33 U.S.C.A. § 203, but they failed to do so. The hazards of navigation, even under the favorable conditions which prevailed on the day of the collision, demanded the exercise of caution under the circumstances which confronted The Excalibur at the time. The Flying By, 3 Cir., 71 F.2d 968. That was The Excalibur's second fault for if she had sounded the "alarm" signal it was still possible to avoid a collision.

Then, in disregard of her previous two-blast signal calling for a starboard to starboard crossing, she began to steer a course to starboard, heading toward mid-channel, and, after proceeding a short distance, she sounded a one-blast signal which is the call for a port to port crossing.

That was her third navigational error and the one which put the vessels almost in extremis, for by that time the distance between them was approximately one-half mile, about three times the aggregate ship-lengths of the vessels, and too short a distance to permit the most effective maneuvering.

But The Excalibur continued to steer a course to starboard although The Colombia was turning to port in compliance with the Excalibur's two-blast signal for a starboard to starboard crossing. It seems inconceivable that the navigators of The Excalibur could have failed to see the imminent danger of a collision between the vessels, nevertheless, they did not sound a danger signal even then and The Excalibur continued to turn to starboard.

Hearing the one-blast signal, and observing the maneuvers of The Excalibur, The Colombia had no alternative but to sound her one-blast signal in reply and turn her rudder hard to starboard. By that time the vessels were so close together that a collision appeared to be inevitable and The Colombia's pilot, in an effort to reduce the shock of the impact and the resultant damage, ordered her engines full speed astern and sounded the danger signal. Moments later the vessels collided, causing substantial damage to both vessels and their cargoes.

As to many important matters the testimony of Pilot Beinert, of The Excalibur, supports The Colombia's version of what occurred prior to the collision. Elsewhere in his testimony Beinert was frequently uncertain, indefinite, and even evasive. Counsel for The Excalibur attributes this to his confusion and inexperience as a witness, observing that he, Beinert, conns a ship better from the bridge than the witness stand. From the testimony in this case it appears that he did not do it well from the bridge on the day of the collision.

The first navigational error of The Excalibur, the crossing over from the west side of the channel, where she should have remained, to the east side, while not the proximate cause of the collision, certainly contributed toward it, for if she had complied with the rules of the road there would have been no collision. According to the evidence there is no doubt that it was

safe and practicable for her to continue along her starboard (the Staten Island) side of the channel toward the Narrows.

On at least two other occasions between that crossing-over and the collision The Excalibur was guilty of faulty navigation which contributed to the collision.

According to the testimony, the master of The Colombia took control of the vessel from Pilot Jones immediately before the collision and ordered her rudder hard left. Counsel for The Excalibur contend that it was error for him to do so. But the vessels were then in imminent peril and he felt that since a collision appeared to be inevitable he had to act quickly in an effort to mitigate the resultant damage. Instead of constituting a fault I think his actions were those of a careful and intelligent master who was concerned with the safety of the passengers, crew, vessel and cargo in his charge. Even if his action was error—and I hold that it was not—it was not such a fault as would justify condemning The Colombia.

If there was any fault on the part of the navigators of The Colombia—and I am aware of none—it was minor, and did not contribute to the collision. I am satisfied that they made every possible effort to avoid a collision. Any changes which she made in her course after the vessels first sighted each other were necessitated by either the signals or the faulty maneuvers of The Excalibur.

I am convinced that the errors and faults in navigation committed by The Excalibur, which were clear and unmistakable, were the sole contributing causes of the collision.

For the foregoing reasons a decree will be made holding that The Excalibur was solely responsible for the collision and for the damage to the vessels and cargoes resulting therefrom, and exonerating The Colombia and her owners from any liability therefor.

Submit proposed findings of fact, conclusions of law and decree in conformity herewith.