GRAHAM et al. v. UNITED STATES.

SHELL OIL CO., Inc. v. UNITED STATES.

UNITED STATES v. The R & Y et al.

Nos. 1231, 1245, 1409.

United States District Court
E. D. Louisiana, New Orleans Division.

April 9, 1953.

Dart, Guidry & Price, Henry J. Read, John N. McKay, U. S. Dist. Atty., Lansing L. Mitchell, Asst. U. S. Dist. Atty., Joseph V. Ferguson, II, Richard B. Montgomery, Jr., New Orleans, La., proctors for libellants.

John N. McKay, Deutsch, Kerrigan & Stiles, Terriberry, Young, Rault & Carroll, Benj. W. Yancey, New Orleans, La., proctors for respondent.

Deutsch, Kerrigan & Stiles, New Orleans, La., proctors for intervenor.

CHRISTENBERRY, Chief Judge.

The above-entitled consolidated causes having come on for final hearing on the pleadings and proofs of the respective parties, and having been argued by respective proctors, the Court, being fully informed in the premises, after due deliberation, makes the following findings of fact and conclusions of law:

Findings of Fact

### I.

On November 26, 1945, at approximately 8:15 P.M., the S. S. Rosebud, a T–2 type tanker, was proceeding up the Mississippi River toward College Point at a speed of 12½ to 15 miles an hour, near the west or right descending bank. Her draft was about 20 feet.

### II.

At College Point the Mississippi River bends sharply to the right as a vessel proceeds upstream. Thus, as The Rosebud proceeded upstream she was running the bend and was not running the point. Rich Bend Light is on the west bank opposite College Point, and St. James Light is approximately 1½ miles upstream, also on the west bank of the river. At College Point, on November 26, 1945, the river had a depth of 30 feet, over a width of 1,750 feet, ample depth for The Rosebud to run College Point as she was required by custom to do, rather than to run the bend as she was in fact doing.

### III.

As The Rosebud approached the bend in the river at College Point, the tug R & Y was proceeding downriver with a tow comprised of two loaded oil barges. The two barges were made up ahead of the tug, the lead barge being No. 348 and the second barge No. 408.

### IV.

The night was clear and those on board each of the units experienced no difficulty in seeing the other unit.

### V.

At approximately 8:15 P.M., as The Rosebud approached College Point, it sighted the tug R & Y and her tow on its starboard bow at a distance of approximately one mile, and those aboard The Rosebud could not determine the tug's position with reference to the banks of the river. The pilot of The Rosebud gave a two–blast signal indicating a starboard to starboard passage, to which the tow replied with the danger signal. The pilot of The Rosebud answered with the danger signal and followed with two blasts again, and once more the tow answered with the danger signal. Whereupon, the pilot of The Rosebud sounded the danger signal, again sounded two blasts, and this time received no reply. The Rosebud's engines were put astern at 8:20 P.M. and she was in collision with the forward barge of the R & Y tow at 8:23 P.M. (Except for the fact that the pilot of The R & Y testifies that following each of his danger signals he also blew a one-blast signal indicating an intended port to port passage, there is no variation between the signals testified to by both sides. The pilot of The R & Y testifies that he sounded a one-blast signal when the vessels had approached within one-half mile of each other. However, if he is correct, this signal of his had absolutely nothing to do with the subsequent collision since The Rosebud witnesses are unanimous in stating that they did not hear it.)

### VI.

The tug R & Y sighted The Rosebud about the time the tug was abeam of St. James Light. At this time The R & Y was approximately 300 to 350 feet from the right-hand descending bank or west bank. Thereafter, the pilot of The Rosebud set a course directly for Rich Bend Light in the bend at College Point, running approximately 300 to 350 feet from the west bank at all times. The speed of the tow was approximately five miles an hour. Upon hearing the two-blast signal from The Rosebud announcing The Rosebud's determination to run the bend, The R & Y sounded the danger signal and reduced speed. She did not immediately reverse her engines because of the danger of losing control of her tow in the current in the bend. However, well in advance of the collision The R & Y did in fact reverse.

### VII.

Notwithstanding her having heard the repeated danger signal from The R & Y, The Rosebud continued on her course into the bend, making no effort to get away from the west bank and out into the river, and continued full ahead, without stopping

or reversing, until it was too late to avoid collision. She proceeded into collision striking the lead barge of the tow at a point some 300 feet from the west bank, grounding almost immediately thereafter on that bank.

## VIII.

As a result of the collision, Barge GB 348 partially sank and she lost her cargo of crude oil.

## Conclusions of Law

### I.

The S. S. Rosebud was solely at fault for the collision.

### II.

■ The S. S. Rosebud was in violation of the established custom in the Mississippi River which requires the ascending vessel to run the points and the descending vessel to run the bends. The John D. Rockefeller, 4 Cir., 1921, 272 F. 67; The Borgestad, 1923 A.M.C. 607; The Woodfield, 1923 A.M.C. 1106; Bisso Towboat Co. v. U. S., 5 Cir., 6 F.2d 132, 1925 A.M.C. 951; The Managua, 5 Cir., 7 F.2d 990, 1925 A.M.C. 1479; The Stephen R. Jones, 5 Cir., 27 F.2d 208, 1928 A.M.C. 1387; The Norne, 5 Cir., 59 F.2d 145, 1932 A.M.C. 1598.

### III.

Those in charge of The Rosebud had no justification for failing to honor the custom aforesaid, for there was sufficient water at College Point for the two units to have passed in accordance with the custom, particularly in view of the fact that those in charge of The Rosebud sighted The R & Y before she got into the bend and, therefore, had plenty of time to get out into the river for the usual and customary port to port passage.

### IV.

Those in charge of The Rosebud were in violation of Article 332.1 of the Western River Rules in that they insisted upon a starboard to starboard passage in the face of an objection from the descending vessel, and furthermore, persisted in their refusal to allow the descending vessel the right of way and its prerogative to choose the manner of passage it deemed proper.

### V.

Those in charge of The Rosebud failed, without any justification, to stop and reverse engines upon hearing the danger signal from The R & Y.

### VI.

On the other hand, the pilot of The R & Y was navigating in that portion of the river where he was required to be by law and by custom. Confronted with this dangerous situation, which was not of his making, he perhaps did not observe the letter of the Western River Rules by immediately reversing his engines. However, the evidence establishes that he did reverse his engines well in advance of the collision, and in ample time, and in the opinion of the court some hesitation on his part was justified by the real danger that reversal of the engines of the tug would cause him to lose control of his tow, and cause the tow to fall helpless athwart the current. In any event, this did not cause or contribute in any way to the collision.

### VII.

■ The fault of The Rosebud is clear, gross and inexcusable in her failure to obey the well-established and judicially approved custom of running the point, in her failing to give The R & Y the right of way to which she was entitled under the law, and in continuing to run full speed ahead in the face of The R & Y's repeated danger signal. In this situation, where the fault of The Rosebud is so flagrant and is the real cause of the collision, the case is one for the application of the major-minor fault rule, and the technical fault, if fault it was on the part of The R & Y in not reversing earlier, is a slight fault, did not in the court's opinion contribute, and will be disregarded. The Admiral Schley, 131 F. 433; The Pallanza, 2 Cir., 189 F. 43; The City of New York, 147 U.S. 72, 73 at page 85, 13 S.Ct. 211, 37 L.Ed. 84; The Oregon, 158 U.S. 186 at page 204, 15 S.Ct. 804, 39 L.Ed. 943; The Victory, 168 U.S. 410 at page 423, 18 S.Ct. 149, 42 L.Ed. 519.