223 F.2d 404
 BOUCHARD TRANSPORTATION CO., Inc., owner of THE BTC NO. 10,
Libellant-Appellee,
v.
THE PROVIDENCE, Red Star Towing & Transportation Company,
Claimant-Respondent-Appellant, THE ROWEN CARD,
McAllister Brothers, Inc.,
Claimant-Respondent-Appellant.
McALLISTER BROTHERS, Inc., as owner of The Rowen Card,
Libellant-Appellant,
v.
THE PROVIDENCE, and Red Star Towing & Transportation
Company, Claimant-Respondent-Appellant.
SHERIDAN TRANSPORTATION CO., as chartered owner of The
Providence, Libellant-Appellee,
v.
THE PROVIDENCE, Red Star Towing & Transportation Company,
Claimant-Respondent-Appellant, The Rowen Card,
McAllister Brothers, Inc.,
Claimant-Respondent-Appellant.
 No. 206, Docket 23347.
 United States Court of Appeals Second Circuit.
 Argued March 8, 1955.
Decided June 3, 1955.
 
 Krisel, Beck & Taylor, New York City, (Maurice A. Krisel and Max Taylor, New York City, of counsel), for libellants-appellees Bouchard Transp. Co., Inc. and Sheridan Transp. Co.
 Macklin, Speer, Hanan & McKernan, New York City (Leo F. Hanan, New York City, of counsel), for appellant Red Star Towing & Transp. Co.
 Purdy, Lamb & Catoggio, New York City (Vincent A. Catoggio, New York City, of counsel), for appellant McAllister Bros., Inc.
 Before MEDINA and HINCKS, Circuit Judges, and BURKE, District Judge.
 MEDINA, Circuit Judge.
 
 
 1
 This is another one of those collisions one would have said could not happen. Under ideal weather conditions on a clear night, with excellent visibility, and all lights burning brightly according to regulations, two flotillas approached one another in the Arthur Kill (Chart 286). Each of the two tows, the Providence and the Rowen Card, were carrying fully loaded barges, over two hundred feet in length; and the Rowen Card and her burden were favored by a flood tide running in the neighborhood of 1 1/4 knots. The chart discloses a winding channel with a bend beginning at the large flashing buoy No. 10 as one faces north, or in the direction in which the Rowen Card was proceeding; and there is a further bend, or a continuation of the first one, marked by flashing green buoy No. 11 on the west and flashing red buoy No. 12 on the east. The collision occurred on the easterly or Staten Island side of the channel, about 250 yards, more or less, southeast of buoy No. 12, at the place marked 'c' on the chart, Rowen Card's Exhibit No. 2.
 
 
 2
 The tug Providence had the coal barge Providence in tow, and the latter was of wooden construction with a pointed bow. The Rowan Card towed the tank barge B.T.C. No. 10. At the moment of impact the Rowen Card flotilla was 'partially crosswise' in the channel and the bow of the barge Providence hit the stem of the Rowen Card a glancing blow and collided with the B.T.C. No. 10 at an angle of 35 degrees to 40 degrees, at a point about 70 feet from the stern of the B.T.C. No. 10.
 
 
 3
 Obviously, the barges were properly exonerated; and it is clear that the proofs amply sustain the ruling that the tug Providence was at fault. She was not only well over on the wrong side of the channel but she had been there for some time, according to the testimony of Captain McGinnis, of the Rowen Card, apparently cutting the bend. A backing and stopping, backing and stopping operation of the Providence, inevitably threw the whole flotilla to port; and, despite the fact that a port to port passage had been agreed upon, the mate of the Providence, who was in command in the temporary absence of the captain, gave no orders to the bargee, who was at the wheel of the barge Providence awaiting orders, to steer to starboard. While the barge had no power aboard, the wheelhouse amidships was provided with steering gear for just such a purpose. Moreover, the trial judge rejected the Providence version of the collision, and he was quite justified in doing so, as he saw many of the witnesses and passed upon their credibility, and because the subordinate facts made the Providence version improbable.
 
 
 4
 But he found both tugs to blame; and we shall now proceed to examine the specifications of faulty navigation charged against the Rowen Card.
 
 
 5
 The first of these is that the Rowen Card 'should have reduced her weigh sooner and should have shaped her course so as to avoid the collision.' But a port to port passing had been stipulated and the Rowen Card was well over on her own side of the channel. Her 'partially crosswise' position in the fairway was due to her right wheel, in her effort to get out of the path of the Providence, so that the port to port passing could be negotiated. True it is that, as found by the trial judge, the Rowen Card continued without reversing her engines until 'she was within 50 to 60 feet' of the barge Providence, but she had already reduced her speed and it is possible that, in the absence of stopping and reversing her engines, the flotillas might have passed without mishap, as the impact was not far from the stern of the B.T.C. No. 10. Accordingly, we think there was no basis for a finding of fault for failure to reverse sooner. Indeed, it is seldom that a fault of this kind can justly be attributed to an otherwise unoffending ship when the other vessel is clearly at fault.
 
 
 6
 Nor can we find support in the record, other than in the rejected version given by the Providence witnesses, for the finding that the Rowen Card 'had swung slightly beyond her half of the channel' and that 'she was attempting to head back toward Staten Island and toward her proper half of the channel.' Inadvertently, the trial judge seems to have drawn this inference from the 'partially crosswise' position of the Rowen Card flotilla in the fairway, above referred to, and perhaps also to the fact that when the two tows were separated by approximately 300 to 400 feet the green light of the tug Providence was for a time visible to the Rowen Card.
 
 
 7
 What appears to have misled the trial judge is the testimony concerning the course followed by the Rowen Card after she backed away from the Hess Oil Company pier, swung to starboard and headed upstream. The finding states that when approximately 200 feet off the Hess Oil Company premises the Rowen Card and her tow were 'slightly west of the center of the buoyed channel,' and that 'she set her course so as to head for the vicinity of Bug Light No. 10.' As a matter of fact, a position 200 feet off the Hess Oil Company pier would place the Rowen Card some considerable distance west of the center of the channel, rather than 'slightly' west of it. Taking this to be so, as the accredited testimony plainly indicates that the Rowen Card was about 200 feet off the pier when she headed north, still a diagonal course upstream to flashing buoy No. 10 would be proper, in the absence of any interfering traffic coming from the opposite direction. It was not necessary under the conditions which prevailed here for the Rowen Card to keep backing until she reached a point on the other side of the channel before heading upstream, nor was she required immediately to proceed to her side of the channel after she made the turn to starboard after backing out in the fairway. Indeed, there is every reason to suppose that, when the Rowen Card reached flashing buoy No. 10 she was entirely on her own side of the channel rather than 'slightly' to the west of it. Moreover, as the Providence was so far to the east, encroaching upon the Rowen Card's territory, her green light might well have been momentarily visible to those aboard the Rowen Card, even if the Rowen Card was entirely on her own side of the channel, as the Providence was gradually turning to port.
 
 
 8
 Had those operating the Providence kept their heads, there is little doubt that the flotillas would have cleared one another; but the combination of what must have been inattention or faulty observation to begin with, followed by cutting the bend, the futile and ill-judged backing and stopping maneuver, which by itself and under other attendant circumstances might well have been considered an error of judgment in an emergency, and the failure to operate the steering apparatus on the barge Providence, were too much.
 
 
 9
 We cannot discern any fault on the part of the Rowen Card and the findings against her must be set aside.
 
 
 10
 The case is remanded with a direction that the decree be so modified as to exonerate the Rowen Card.