Lewis F. BOYER and Thornton D. Hooper, owners of THE Barge INTERSTATE NO. 12, Libellant,

v.

THE Tanker SENECA SUN, her tackle, equipment, etc., and Sun Oil Company, owner and operator of said tanker, Seneca Sun, Respondent.

The Cross Libel of SUN OIL COMPANY, owner of the M/V Seneca Sun, Cross-Libellant,

v.

THE Tug ELIZABETH S. HOOPER and Barge "Interstate No. 12," their tackle, equipment, etc., and Lewis F. Boyer and Thornton D. Hooper, owners and operators of the said tug, Elizabeth S. Hooper and barge, "Interstate No. 12," Cross-Respondents.

No. 165 of 1953.

United States District Court
E. D. Pennsylvania.

June 19, 1956.

---

3. See 1 Benedict on Admiralty, 6th ed. § 80, and cases there cited.

John V. Lovitt, of Beechwood & Lovitt, Philadelphia, Pa., for libellant and cross-respondents.

Timothy J. Mahoney, Jr., of Krusen, Evans & Shaw, Philadelphia, Pa., for respondent and cross-libellant.

VAN DUSEN, District Judge.

This proceeding consists of an action by libellants against the tanker Seneca Sun, her tackle, equipment, etc., and against her owner, and a cross-action by respondent-owner of the Seneca Sun against the tug Elizabeth S. Hooper and the barge Interstate No. 12, their tackle and equipment, and against their owners. The actions result from a collision which occurred in the Chesapeake Bay about 1,500 yards south of the span of the Bay Bridge in May 1952.

### Findings of Fact

1. This collision involved three craft which were regularly employed in inland and coastal traffic. They were:

A. Seneca Sun is a single screw tank vessel with approximately a thirty-foot beam and an overall length of two hundred feet. She is powered by twin Bessemer Diesels, capable of operating in harness or independently. Carrying a

full cargo of 4,800 barrels of gasoline, as in this instance, she could make seven knots using both engines or about four knots using only one. The wheelhouse was situated on the forward half of the vessel. She had little freeboard when loaded (one and one-half feet) so that frequently her foredeck was awash.

Her crew on duty consisted of Master, Helmsman and Chief Engineer. Her speed was controlled from the wheelhouse but a switch from one to both engines or vice versa required certain manipulations in the engine room. Such a change-over required three or four minutes time and made it necessary to disconnect the operating engine (or engines) from the shaft during the time that the change-over was taking place.

B. Elizabeth S. Hooper was a diesel tug with a twenty-three foot beam and an overall length of seventy-nine feet. With her tow she was making five and one-half knots. Her wheelhouse, which was situated forward of her stack and the Master's quarters, had a small door (30 inches wide) which opened aft on the port side and another on the starboard side. Through the windows in the top of these doors it was possible to keep a lookout aft, but a clear view astern could not be obtained solely from one window or the other. She carried red and green side lights, a white bow light and three vertical lights on her aft pole which signified that she was towing a vessel behind on a hawser. The hawser to her tow was made fast to the tug's main bitt, located 20 to 25 feet from the stern of the tug.

The Hooper's crew on watch consisted of a Master who had the helm, a deck hand, and an Engineer.

C. Interstate No. 12 was a rudderless, rectangular, steel, seagoing, tank barge with a forty foot beam and approximately one hundred ninety feet in length. She had "shags" or fins on her sides aft to keep her on a straight course. She

had a sled bow and crew quarters in a deck house located at her stern end. She was carrying a capacity load of 14,000 barrels of gasoline. The "Interstate" had bow corner bitts to which a bridle was secured and paid out to the "Hooper's" hawser. The bridle consisted of two forty to fifty foot cables joined at a ring which was attached to the hawser. She carried red and green side lights and two white lights on her deck house mast in a horizontal line 12′ to 15′ above the water line.

Her crew consisted of two deck hands, who were in the deck house at the time of the collision.

2. Libellants and cross-respondents (hereinafter called libellants) are the owners of tank barge Interstate No. 12 and tug Elizabeth S. Hooper.

3. The respondent and cross-libellant Sun Oil Company (hereinafter referred to as respondent) is the owner of the tanker Seneca Sun.

4. The Seneca was inbound to Baltimore and was moving at four knots, powered only by her starboard engine. She was scheduled to dock at daybreak and, accordingly, she had cut her port engine out at 7:30 P.M., hoping to avoid a premature arrival.

5. The Hooper with her tow was headed down the Chesapeake toward Cape Henry and had, just minutes previously, cleared under the Bay Bridge which was then under construction. On either side of the bridge was a considerable area within which were buoys and piles used in construction, on some of which were lights (N.T. 165–7). The hawser to her tow was estimated by those on the Seneca to have been as much as 2,000 feet long. The Master of the tug testified that it was two hundred fathoms (1,200 feet) and further said that not quite all of it had been paid out from the tug. There was at least 1,100 feet from the stern of the tug to the bow of the barge.[1]

---

1. Libellant's witnesses admitted the hawser length was 1,200 feet and stated about 100 feet of this was not used on this occasion. The length of the crinkle or bridle was 50 feet and the distance of the bitt on the tug from the stern of the tug was about 20 feet, making a net addition of some distance to the length of the used part of the hawser.

6. The marked ship channel under the Bay span was not over 1500 feet wide. The chart which is in evidence seems to indicate that it was somewhat narrower. The dredged channel to Baltimore started just north of the bridge. There was deep water for a considerable area east and west and south of the southern entrance to this marked course through the bridge area. The bridge channel on its lower or south side was marked on the west (or downbound) side by Flashing White Buoy 3W and on the east (or upbound) side by Flashing Red Buoy 4W. These buoys were a half mile below the bridge. In addition, a line-up buoy, Flashing Red Buoy 2W, was situated half a mile to the south of Buoy 4W and, therefore, a mile below the bridge on the eastern side of the approach channel. A reverse but otherwise similar arrangement of buoys existed northward of the bridge, their purpose being to mark the limits of the channel open for navigation under the span and to enable a vessel approaching on its own proper starboard side to line up its course for safe passage.

7. The date of the collision was May 18, 1952. As the vessels approached one another, it was close to 11 P.M. There was only a light southerly breeze and visibility was excellent. The weather was clear and the tide was about ebb.

8. When the Seneca and Hooper sighted one another, the Hooper was seen "in the vicinity" of the bridge and the Seneca was approximately three or four miles away to the southward, 15 to 20 degrees off the tug's port bow. The Seneca had already lined up with the starboard hand buoys (Flashing Red, 4W and 2W) and was keeping them nearly in line. The Hooper steered the center of the channel under the bridge and then, according to Robertson, her Master, steered a steady south south west.

9. Captain Robertson (Master of the Hooper) testified that he looked back at the barge every four or five minutes, but that he did not look back between the time he passed the Seneca and the time of the collision. Mr. Collins, the deckhand in the pilot house with Captain Robertson, testified that he looked back at the barge every five or ten minutes. On direct examination, he testified that he looked back at the barge once after passing the Seneca Sun, at which time there was "plenty of distance" between the tanker and the barge as they were on parallel courses. The next time he looked back, the tanker was beyond the barge and he saw flashing lights from the barge (see paragraph 15 below). Mr. Collins testified that the tanker and the tug maintained their same parallel courses after passing and that the first time he saw the tanker, after the vessels had passed each other, it was 1,000 feet to one-quarter mile behind the tug and the second time it was one-half mile behind the tug.

10. The engineer of the tug testified he received a "slow bell" at 11 P.M. (see C–L 8). As a result of this signal, the speed of the tug was reduced. The captain of the Hooper (Mr. Robertson) and the seaman in the wheelhouse with him testified that the barge was towing straight behind the tug and not sheering when observed by them.

11. As the Seneca approached on roughly a parallel course, only her red port light was visible to those aboard the Hooper. Likewise, the Seneca had only the red port light of the Hooper in view. It was obvious that they would make a port to port passing on parallel courses at a distance and, therefore, neither sounded any whistle signals.

12. According to Robertson, the Hooper and the Seneca passed abeam at a distance of three-eighths of a mile (2250 feet).

Collins, the Hooper's deck hand, estimated the distance to be three-quarters of a mile (4,500 feet).

On the other hand, Captain Pedersen estimated the distance as "about 600 feet."

The Seneca's helmsman, Wyshinski, put it at "400, 5—, 450 to 500 feet off."

The estimates of the Seneca's witnesses appear to be more reliable. The Hooper's Captain said that using his searchlight he could barely read the Seneca's name as she passed.

As the Seneca and the Hooper passed, having in mind that the latter was carrying three vertical white lights, Pedersen and Wyshinski looked for her tow astern. Wyshinski expected it to be close behind because the Hooper had just come through the bridge, but he picked up its red port light "North, away towards the bridge, towards the entrance of the bridge." At this time, Wyshinski was steering with the eastern line-up buoys slightly broken so that he could expect to pass them about thirty feet off.

13. Captain Pedersen had the Interstate in view and judged that the Seneca and the barge would pass abeam with the same easy clearance as the passing between the Seneca and the tug. As he kept the barge under continuous observation from the wings of the bridge, he saw "the green light starting to show up" so that he saw both sidelights of the barge. At first it appeared that the barge was taking a typical yaw on its bridle, but when he continued to see both lights for a space of seconds, he ordered hard right helm. After that, the red port sidelight of the barge closed out altogether and the barge appeared to be heading directly toward the Seneca at a 45-degree angle away from her own course. As the barge neared to about one hundred feet of the Seneca, it appeared that it would strike the Seneca's port side midships. To avoid being struck in the area of the Seneca's tanks, Pedersen ordered the rudder put hard left in an attempt to throw his stern away to his own starboard, thereby taking the blow on the port after quarter. At the same time, he

" * * * heard a swishing sound in the water and I stepped out in the side of the wing of the bridge, and I saw the hawser on the barge had a bight (slack in the hawser), and all of a sudden tighten up the bight, and immediately the barge started to straighten out and pull away from my ship." (N.T. 104).

In combination, the Seneca's hard left and the fetching up of the slack in the hawser to the Interstate were sufficient to avoid a right angle collision. Instead, the sledlike projection of the barge's bow came over the port after quarter of the Seneca and scraped aft, damaging her stanchions, bulwark and hull above the fender line. Moreover, the nature of the contact helped to push the vessels apart so that the barge finally fell away astern, being pulled once more on a taut hawser.

14. At a point about 50 feet south south west of Red Buoy 2W and on the eastern edge of the marked channel but in the deep water of the Chesapeake Bay, a collision occurred at 11:05 P.M. between the barge and the Seneca Sun. The point of contact on the barge was on the port bow and on the Seneca Sun the port after quarter (R–Ex. 5). About 1¼ minutes elapsed between the passing of the Hooper and the Seneca Sun and the time of the collision.

15. Prior to the collision, the barge deck hands were in its deck house. One was washing himself and the other was waiting to wash. They rushed out on deck upon feeling the collision impact. It was about five minutes before they examined the damage to the barge and recovered sufficiently from their fright to signal the Hooper. Then, after several additional minutes of waving a flashlight, the Hooper's deck hand saw the signal and remarked about it to the Master. At first, Robertson chided him that he was simply seeing the White Flashing Buoy on the west side of the bridge channel, but, after looking around himself, he was convinced that it was a distress signal from his barge and he rounded the tug back to the barge.

16. The Engineer of the Hooper furnished a statement that he "got a slow bell at about 11:00 P.M." The deck log of the Seneca shows that the collision occurred at 11:05 P.M. This time notation was also later furnished to the Engineer of the Seneca for entry in the engine log.

Immediately after the collision, the Engineer of the Seneca put the port engine of the Seneca into operation. This was done to power the pumps which he thought might be needed for fire fighting. He recorded this time as "11:00 P.M." but he relied on his own wrist watch, which was apt to be inaccurate, in making the engine log entry.

17. It takes longer to break a sheer of a loaded barge being towed on a long hawser than it does to break a sheer of such a barge being towed on a shorter hawser.

18. It was not dangerous or inadvisable to have a hawser of approximately 600 feet under the circumstances existing prior to and at the time of the collision.

19. The Seneca Sun failed to sound any "danger signal" immediately prior to the collision because of a reasonable probability that such a signal would result in injury to the personnel aboard the "Seneca Sun" and that such signal would have, in all probability, no effect on avoiding a collision.

### Discussion of the Law

It is well settled that a ship which has failed to observe a rule of navigation "shall be deemed to be in fault, unless it is shown to the satisfaction of the court that the circumstances of the case make a departure from the regulation necessary." See The Pennsylvania, 1873, 19 Wall 125, 135, 86 U.S. 125, 135, 22 L.Ed. 148. In this case, the tug failed to observe these two rules of navigation and the observance of these rules would have, in all probability, made the collision impossible:

A. The tug did not keep to that side of the channel under the Bay Bridge which lay on its starboard side.[2]

The collision occurred within 50 feet of the eastern line-up buoy (Red 2W) for this channel and this buoy was about one-half mile south of the southeast corner of the channel, which corner was marked by Buoy Red 4W (see Finding 6). If the tug had set its south south west course from the southwestern corner of the channel, the barge would never have come within 100 feet of this Red 2W Buoy. See Commonwealth & Dominion Line, Ltd. v. Seaboard Transportation Co., D.C.D.Mass.1919, 258 F. 707, 709; The Alfred W. Booth, D.C.S.D.N.Y. 1903, 127 F. 453, 455; Det Forenede Dampskibs-Selskab A/S v. The Excalibur, D.C.E.D.N.Y.1952, 112 F.Supp. 205, 207–208.

B. The length of the hawser used at the time of the collision was greater than that permitted by the rules governing the length of a hawser under such circumstances.[3]

---

2. 33 U.S.C.A. § 210 provides:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

Findings 6 and 8 show that the tug steered through the center of a channel not over 1500 feet wide and then followed a south south west course. Even if the trial judge should be in error in his finding that the narrow channel rule is applicable, the tug and barge are responsible for faulty navigation in failing to give the tanker a wider berth in passing. See The Colonel John F. Gaynor, 3 Cir., 1904, 130 F. 856, 859. The tug had a duty to keep its tow in line and the presence of the barge at the place of the collision is itself proof of faulty navigation. See The Howard, D.C.Md.1916, 253 F. 599. The Hygrade No. 12, D.C.E.D.N.Y.1940,

33 F.Supp. 149, affirmed, Tanker Hygrade No. 12, Inc., v. Moran Towing & Transportation Co., 2 Cir., 1942, 130 F.2d 256; Yachts, Inc., v. The Edward F. Farrington, D.C.E.D.N.C.1955, 130 F.Supp. 542, affirmed, Norfolk, Baltimore and Carolina Line, Inc., v. Yachts, Inc., 4 Cir., 1955, 226 F.2d 855.

3. 33 U.S.C.A. § 152 provides that the Commandant of the Coast Guard "shall" prepare rules limiting the length of hawsers and "such regulations shall have the force of law." These rules provide, inter alia, as follows:

"Section 304.1 Tows of seagoing barges within inland water.—Tows of seagoing barges navigating the inland waters of the United States are limited in length to five vessels, including the towing vessel or vessels.

"304.2 Hawser length; general.—With the exceptions noted below, hawsers are

As stated in Finding 5, the effective hawser length was approximately 1100 feet and Finding 18 reads "It was not dangerous or inadvisable to have a hawser of approximately 600 feet under the circumstances existing prior to and at the time of the collision." The only reasons given by Captain Robertson for using a hawser of more than 75 fathoms (450 feet) were (a) that he would make better time which would please his employer,[4] (b) the barge would follow better and (c) there was some risk to a short hawser line from swells created by passing large ships in the bay. This last reason does not make advisable the use of a long hawser through the narrow channel under the Bay Bridge at this time, when there was no large ship in sight and his visibility down the bay extended for many miles. More persuasive testimony was given by Captain Pedersen and the independent expert, Captain Hearn, that the use of a 600-foot hawser would have enabled the barge to follow just as well and that a hawser of that length or of a shorter length would have been definitely preferable under the circumstances.[5] The presence of the barge on the wrong side of the channel could have been caused by a sheer resulting from the change of course to south, south west from the approximately south west course, which would have been the approximate course down the center of, and parallel to, the channel under the Bay Bridge, or from the use of a hawser and bridle having a length of about 1100 feet.[6] The inadvisably long hawser certainly contributed to the extent of this sheer or movement of the barge to the east side of the channel.

There is no convincing evidence that the Seneca Sun was responsible for any fault which caused or contributed to the collision. The rule is clear that there shall be no division of damages if the reasonable probabilities disclose that any fault for which the Seneca Sun may have been responsible did not cause or contribute to the accident. See Seaboard Tug & Barge, Inc., v. Rederi AB/DISA, 1 Cir., 1954, 213 F.2d 772, 775;[7] Koch-Ellis Marine Contractors, Inc., v. Chemi-

limited in length to 75 fathoms, measured from the stern of one vessel to the bow of the following vessel; and should in all cases be as much shorter as the weather or sea will permit.

"304.3 Hawser length; exceptions.— In all cases where, in the opinion of the master of the towing vessel, it is dangerous or inadvisable, whether on account of the state of the weather, or sea, or otherwise, to shorten hawsers, hawsers need not be shortened to the prescribed length, except that hawsers must in any event be shortened to the prescribed length upon reaching the applicable locality named below:

\* \* \* \* \*

"(b) Tows bound up the Chesapeake to the northward of Baltimore Light.

\* \* \* \* \*

"(f) Hawsers may also be lengthened in the same places, under the same circumstances when tows are bound out."

4. The primary reason why Captain Robertson appeared to favor the long hawser appears from the following testimony at p. 183:

"Q. Well, why were you carrying a long hawser? A. Because I was trying to make as much time for the company I worked for as I could.

"Q. Well, then, you felt that it was of benefit to your employer? A. Absolutely. I mean, if I don't go along and make about a mile an hour, I don't expect I will stay captain long."

5. Captain Hearn's testimony (N.T. 226 ff.) that propeller wash would have a negligible effect on a barge at 600 feet was more convincing than the testimony of Captain Robertson that such wash would be "felt" at that distance (N.T. 185).

6. Also, it might have been caused by the slowing down of the vessel as the result of the eleven o'clock slow bell or by others factors, in view of the long hawser. See testimony of Captain Hearn, pp. 225–250.

7. In this case, the court said at page 775:

"We cannot believe that the Supreme Court in The Pennsylvania intended to establish as a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision no matter how speculative, improbable or remote."

cal Barge Lines, Inc., 5 Cir., 1955, 224 F.2d 115, 116.[8]

■■ Libellant claims that the respondent-cross libellant was "guilty of faulty navigation." The contention that the Seneca Sun should have turned to the starboard prior to the time its master gave the hard right rudder order is not supported by the evidence. See Findings 12 and 13. The tanker was steering a course to bring it within 30 feet of the flashing red buoys and it had no duty to anticipate that the barge would be that far over on its side of the channel.[9] There is no reason to suppose that reversing engines by the tanker (which would have taken 3 or 4 minutes, see Finding 1–A) would have avoided, or diminished the severity of, the collision to the extent that the hard right and then hard left rudder did.[10] As stated in Bouchard Transportation Co. v. The Providence, 2 Cir., 1955, 223 F.2d 404, 405, " * * * we think there was no basis for a finding of fault for failure to reverse sooner. Indeed, it is seldom that a fault of this kind can justly be attributed to an otherwise unoffending ship when the other vessel is clearly at fault."

■ The failure of the Seneca Sun to sound a danger signal was justified under the circumstances and there is no reason to believe that such a signal would have contributed to avoiding, or diminishing the severity of, the collision (see Finding 19 [11]). See Mathieson Chemical Corp. v. The Sadie (Union Victory-Tug Sadie and Tow), D.C.Md.1950, 95 F.Supp. 221, 1951 A.M.C. 270, 278.

■■ The trial judge believes that the presence of the Captain and the helmsman of the tanker on the wings and in the pilot house constituted a proper lookout, but even if they did not, the Captain had the tug under observation at all times after the tanker passed the tug (Finding 13) so that the failure to maintain such a lookout did not contribute to the collision. It is well settled that even the absence of a lookout is not material, where the presence of one would not have availed to prevent the collision. See Rice v. United States, 2 Cir., 1948, 168 F.2d 219, 220 and 221 and cases there cited.[12] Furthermore, the record contains no convincing evidence that libellant maintained an adequate lookout [13] in view of the require-

**8.** See also Ore S.S. Corp. v. The Pan Virginia, D.C.D.Md.1954, 123 F.Supp. 346, 351, using this language:

"Where the fault of one vessel is clear and inexcusable the evidence, in order to establish fault also on the part of the other vessel, must be clear and convincing."

Accord: Graham v. United States, D.C. E.D.La.1953, 112 F.Supp. 43, 45; Det Forenede Dampskibs-Selskab A/S v. The Excalibur, supra, 112 F.Supp. at page 209.

**9.** The cases cited by libellant at page 9 of his brief are quite different on their facts from the situation presented in this case.

**10.** Captain Pedersen, who impressed the judge as accurate and conservative in his testimony, stated on cross-examination that he would not have cleared the barge if he had given hard right rudder as soon as he saw the barge's green light (N.T. 146). The time which elapsed between the seeing of the barge's green light and the giving of the hard right rudder

was a matter of seconds (N.T. 119). See Finding 13.

**11.** The master and helmsman on the tug were at all times oblivious of any danger of such a collision and a danger signal would have been just as likely to cause them to decrease the "pull" on the hawser (by circling back to the tow or stopping to observe), which pull was the very thing needed to avert the impact. Where one vessel creates a perilous situation, the other may be required to depart from ordinary rules in order to avoid the danger. See The Tug New York Company v. The Robin Doncaster, 3 Cir., 233 F.2d 889; American Petroleum Co. v. Texas Co., 2 Cir., 1927, 22 F.2d 290, 292–293.

**12.** See also The Lehigh, (The Ballenas), D.C.W.D.N.Y., 12 F.Supp. 75, 1935 A.M.C. 1546, 1558.

**13.** The facts summarized in Finding 9 make clear that a lookout aft was normally made only every five minutes and that only once did the seaman look at the barge between the passing of the tug and the tanker and the time of the collision.

ment that the tug keep a lookout aft, particularly since there was no lookout on the barge. See The Harold, D.C.S.D. N.Y.1898, 84 F. 698; The Samuel Dillaway, 1 Cir., 1899, 98 F. 138; John Connelly, 1930 A.M.C. 390 (U.S.D.C., E.D.N.Y.1930); The Colonel John F. Gaynor, supra, at footnote 2.

For the foregoing reasons, this is a case where the responsibility should rest on the libellant due to the clear nature of its fault. See Theothilatos v. Martin Marine Transportation Company, 4 Cir., 1942, 127 F.2d 1016; Compania De Maderas, etc., v. The Queenston Heights, 5 Cir., 1955, 220 F.2d 120, 123.

## Conclusions of Law

1. The court has jurisdiction of the parties to this proceeding and the subject matter.

2. The striking of the Seneca Sun by the Barge Interstate No. 12 at about 11:05 P.M. on May 18, 1952, near the eastern edge of the upbound side of the narrow channel approach to the Chesapeake Bay Bridge was the result of the faulty navigation of the Tugboat "Elizabeth S. Hooper" and the Barge Interstate No. 12 in the following respects:

(a) The Hooper and its tow violated the Narrow Channel Rule, 33 U.S.C.A. § 210, Article 25.

(b) The Hooper failed to maintain a proper lookout.

(c) The Interstate No. 12 failed to maintain a proper lookout.

Also, it would have been physically impossible for the collision to have occurred if the tanker and the tug had passed as far apart as testified by Captain Robertson and his seaman (see Finding 12) and if the hawser was only 1100 feet long as they maintained.

(d) The Hooper was towing the Interstate No. 12 on a hawser which was too long under the circumstances, in violation of the applicable Hawser Rule [33 U.S.C.A. § 152; Rules Sections 304.1, 304.2, 304.3(b) and (f)].

(e) The downbound Hooper negligently permitted its tow to collide with the upbound Seneca Sun.

3. The Seneca Sun may have been technically at fault in not sounding a danger signal but its fault in this regard was minor, excusable under the circumstances, and, in any event, was not shown to have contributed to the collision. In the face of the gross negligence of the Hooper and its tow, which was wholly sufficient in itself to account for the collision, any doubt should be resolved in favor of the Seneca Sun.

4. A decree, in form to be approved by the Court, will be entered in favor of cross-libellant, Sun Oil Company, owner of the M/V Seneca Sun against cross-respondents, Tug Elizabeth S. Hooper and Barge Interstate No. 12, their tackle, equipment, etc., and their owners, Lewis F. Boyer and Thornton D. Hooper. The Libel of Lewis F. Boyer and Thornton D. Hooper against the M/V Seneca Sun, her tackle, equipment, etc., and Sun Oil Company, is dismissed. Costs are awarded to respondents and cross-libellants.

The requests for Findings of Fact and Conclusions of Law of the libellant are denied insofar as they are inconsistent with the foregoing.